No. 18-35673

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Andrew B. Grimm,
*Plaintiff and Appellant,*
v.
City of Portland, et al.,
*Defendants and Appellees.*

On Appeal From the United States District Court for the
District of Oregon No. 3:18-cv-00183-MO
The Honorable Michael W. Mosman

## AMICI CURIAE BRIEF IN SUPPORT OF
## APPELLANT ANDREW B. GRIMM AND REVERSAL

Barry W. Lee, Stephanie A. Roeser, Noro Mejlumyan, Benjamin G. Shatz
MANATT, PHELPS & PHILLIPS, LLP
One Embarcadero Center, 30th Fl. San Francisco, CA 94111
(415) 291-7400

Rebekah Evenson, Claire Johnson Raba
BAY AREA LEGAL AID
1735 Telegraph Avenue, Oakland, CA 94612
(510) 663-4744

Elisa Della-Piana, Jude Pond
LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA
131 Steuart Street, Suite 400, San Francisco, CA 94105
(415) 543-9444

*Counsel for Amici Curiae*
The San Francisco Coalition On Homelessness,
The Lawyers' Committee For Civil Rights Of The SF Bay Area,
and Bay Area Legal Aid

## CORPORATE DISCLOSURE STATEMENT

Amici (1) the San Francisco Coalition On Homelessness, (2) the Lawyers' Committee For Civil Rights Of The SF Bay Area, and (3) Bay Area Legal Aid are all non-profit corporations that do not have parent corporations, and no publicly held corporation owns 10% or more of any amicus.

March 25, 2019      MANATT, HELPS &PHILLIPS, LLP
                     By:  */s Barry W. Lee*
                        *Attorneys for Amici Curiae*

# TABLE OF CONTENTS

INTERESTS OF AMICI CURIAE ........................................................................7

INTRODUCTION AND SUMMARY OF ARGUMENT .....................................8

THE CALIFORNIA EXPERIENCE:
MUNICIPAL TOW PRACTICES OFTEN RESULT IN THE
PERMANENT DEPRIVATION OF VEHICLES OWNED BY LOW-
INCOME AND HOMELESS INDIVIDUALS...........................................11

ARGUMENT ...................................................................................................18

I    THIS COURT SHOULD NOT APPLY THE *MATHEWS*
STANDARD TO DETERMINE THE ADEQUACY OF NOTICE
THAT DUE PROCESS REQUIRES ........................................................18

    A.    This Court should adopt the *Mullane-Jones* standard.......................18

    B.    The *Mullane-Jones* standard requires the government to take
practicable steps to ensure notice before seizing an indigent
person's vehicle ....................................................................................20

II    ALTERNATIVELY, THE *MATHEWS* STANDARD REQUIRES
CITIES TO DO MORE THAN PLACE A TICKET ON A WINDOW
BEFORE SEIZING A VEHICLE .............................................................21

    A.    Vehicle owners have an important private interest in the
continued possession of their cars.....................................................22

    B.    The risk of erroneous deprivation of an important property
interest favors additional practicable process ...................................25

    C.    The administrative and fiscal burden on the city to provide
adequate pre-tow notice is minimal and favors appellant.................27

        1.    The government interest in parking enforcement does not
outweigh the important private interest in retention of a
vehicle ........................................................................................28

        2.    The administrative and fiscal burden to take additional,
practicable steps is minimal .....................................................29

CONCLUSION ................................................................................................31

# TABLE OF AUTHORITIES

## CASES

*Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy,*
   367 U.S. 886 (1961)..............................................................22

*Chin Yi Tu v. Nat'l Transp. Safety Bd.,*
   470 F.3d 941 (9th Cir. 2006) ...........................................19

*Clement v. City of Glendale,*
   518 F.3d 1090 (9th Cir. 2009) .........................................28

*Covey v. Town of Somers,*
   351 U.S. 141 (1956)..........................................................19

*Desertrain v. City of Los Angeles,*
   754 F.3d 1147 (9th Cir. 2014) .........................................15

*Goldberg v. Kelly,*
   397 U.S. 254 (1970)..........................................................26

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
   341 U.S. 123 (1951)..........................................................26

*Jones v. Flowers,*
   547 U.S. 220 (2006)....................................................passim

*Lavan v. City of Los Angeles,*
   693 F.3d 1022 (9th Cir. 2012) .........................................26

*Lone Star Sec. & Video, Inc. v. City of Los Angeles,*
   584 F.3d 1232 (9th Cir. 2009) .........................................28

*Mathews v. Eldridge,*
   424 U.S. 319 (1976)....................................................passim

*Memphis Light, Gas & Water Division v. Craft,*
   436 U.S. 1 (1978).......................................................24, 25

*Morrissey v. Brewer,*
   408 U.S. 471 (1972)..........................................................21

*Mullane v. Cent. Hanover Bank & Tr. Co.,*
   339 U.S. 306 (1950)....................................................passim

*Nozzi v. Hous. Auth. of City of Los Angeles,*
   806 F.3d 1178 (9th Cir. 2015) .........................................18

# TABLE OF AUTHORITIES
(continued)

*People v. Dueñas,*
  30 Cal. App. 5th 1157, 1171 (2019) .................................................28

*Rivera v. Orange Cty. Prob. Dept.,*
  832 F.3d 1103 (9th Cir. 2016) ........................................................17

*Robinson v. Hanrahan,*
  409 U.S. 38 (1972).........................................................................19

*Robinson v. Purkey,*
  326 F.R.D. 105 (M.D. Tenn. 2018) .................................................24

*Sackman v. City of Los Angeles,*
  677 F. App'x 365 (9th Cir. 2017).............................................25, 30

*Scofield v. City of Hillsborough,*
  862 F. 2d 759 (9th Cir. 1988) ..............................................22, 27, 28

*Smith v. Reiskin,*
  2018 WL 7820727 (N.D.Cal., 2018). ........................................16, 26

*Snider Int'l Corp. v. Town of Forest Heights,*
  739 F.3d 140 (4th Cir. 2014) .......................................................18, 19

*Soffer v. Cost Mesa,*
  607 F. Supp. 975 (C.D. Cal. 1985) ............................................22, 23

*State of Cal. ex rel. Lockyer v. F.E.R.C.,*
  329 F.3d 700 (9th Cir. 2003) ...........................................................19

*Stypmann v. San Francisco,*
  557 F. 2d 1338 (9th Cir. 1977) ........................................................23

*Sutton v. City of Milwaukee,*
  672 F.2d 644 (7th Cir. 1982) ...........................................................28

*Thomas v. Haslam,*
  329 F. Supp. 3d 475, 521 (M.D. Tenn. 2018) .................................28

*Williams v. Mukasey,*
  531 F.3d 1040 ..................................................................................18

*Wong v. City & Cty. of Honolulu,*
  333 F. Supp. 2d 942 (D. Haw. 2004).................................................22

## STATUTES

Cal. Civil Code § 3068.2.........................................................................13

# TABLE OF AUTHORITIES
(continued)

Cal. Veh. Code § 22651(i) ........................................................12

Cal. Veh. Code § 22651(o) .......................................................12

L.A. Mun. Code § 85.02 ..........................................................16

# OTHER AUTHORITIES

Evelyn Blumenberg, Gregory Pierce, Michael Smart, Casey Dawkins,
    Jae Sik Jeon, Eli Knaap, Rolf Pendall, Christopher Hayes, Arthur
    George & Zach McDade, *Driving to Opportunity: Understanding
    the Links Among Transportation Access, Residential Outcomes,
    and Economic Opportunity for Housing Voucher Recipients*
    (The Urban Inst. eds., 2014) ................................................15

Jonathan Berr, *More Americans are Forced to "Reside" in Their Vehicles*,
    CBS News (July 31, 2018) ...............................................15, 16

Lawyers' Committee for Civil Rights et al., *Paying More for Being Poor:
    Bias and Disparity in California's Traffic Court System* (2017) .................30, 31

Lawyers' Committee for Civil Rights et al., *Towed into Debt: How
    Towing Practices in California Punish Poor People* (2019) ....................passim

Margy Waller et al., *Driver's License Suspension Policies*,
    (Brookings Institute 2005) ...................................................24

Paul M. Ong, *Car Ownership and Welfare-To-Work* (2001) .................................15

Paul Ong & Evelyn Blumenberg, *The Transportation Welfare Nexus:
    Getting Welfare Recipients to Work* (1999) ......................................15

Jackie Snow, *8 City Mobile Apps Driving Citizen Engagement*,
    SmartCitiesDive (May 18, 2017)................................................10

Tami Gurley & Donald Bruce *The Effects of Car Access on
    Employment Outcomes for Welfare Recipients*,
    58 J. Urban Econ. 250 (2005) ...............................................15, 24

# INTERESTS OF AMICI CURIAE[1]

The San Francisco Coalition on Homelessness is a non-profit organization that advocates for the rights of the City of San Francisco's homeless population through organizing, advocacy, and publication of a newspaper called the Street Sheet. The Coalition on Homelessness works to address issues systemic to San Francisco's municipal policy of towing cars owned and occupied by vehicularly housed individuals, including towing without providing owners with notice or the opportunity to be heard, *before* depriving them of their cars (and often their homes).

The Lawyers' Committee for Civil Rights of the SF Bay Area ("LCCR-SF") is a non-profit organization that fights for the constitutional rights of individuals throughout California.

Bay Area Legal Aid ("BayLegal") is a non-profit law firm representing low-income individuals and families in the San Francisco Bay Area.

Both LCCR-SF and BayLegal represent vehicle owners who have been permanently deprived of their vehicles as a result of the City of San Francisco's policy and practice of towing cars to collect on municipal debt. Because these vehicle owners cannot afford to pay the balance on

---

[1] The parties consented to Amici's filing a brief. No party or party's counsel authored any portion of this brief, and no one other than Amici or its counsel contributed any money to fund this brief or aid in its preparation or submission.

their outstanding citations and tow-associated fees, their cars are typically sold at auction. Like the City of Portland, San Francisco gives only minimal notice and does not provide vehicle owners with an opportunity to be heard before towing vehicles for this purpose. Thus, San Francisco has deprived, and continues to deprive, BayLegal and LCCR-SF's clients of their homes, their only source of income, and their primary financial asset, without due process of law. This deprivation has significant impacts on vehicle owners, often leaving them in debt and damaging their credit as a direct result of the city towing, and subsequently selling at auction, their vehicles.

## INTRODUCTION AND SUMMARY OF ARGUMENT

When cities tow vehicles for minor, non-emergency infractions, such as accrual of unpaid parking tickets or out of date registration, they should be required to take practicable steps—including, but not limited to, consulting existing, easily accessible electronic databases—to provide vehicle owners with notice *before* seizing their property. This is especially true in the context of the large population of low-income vehicle owners, for whom a tow is not just a tow but, rather, a debt trap plunging them further into poverty. Indeed, for the many low-income individuals who cannot afford to pay the astronomical fees charged to retrieve their cars after a tow, a simple municipal tow often results in permanent deprivation of their vehicle, their home, their sole asset, and the means on which they rely to earn a living.

Whether the Court chooses to apply the *Mullane-Jones* standard or the *Mathews* standard here, it must consider the effects of vehicular tows, as well as the significant benefits of additional process to both vehicle owners and cities. *See Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) ("Due process is flexible and calls for such procedural protections as the particular situation demands…resolution of the issue whether the . . . procedures provided . . . are constitutionally sufficient requires analysis of the governmental and private interests that are affected") (internal citations omitted).

The benefit to low-income drivers is simple and significant: the ability to prevent seizure and permanent deprivation of their vehicles. For example, effective pre-tow notice would allow individuals to contest the grounds for a tow in advance without amassing unnecessary tow and storage fees. More importantly, property owners who cannot afford to immediately pay off outstanding citations could register for the alternative payment options that many cities offer, including community service and payment plans, before incurring further crushing debt resulting from a municipal tow.

Cities will also reap several substantial benefits:

(1)     Cities will avoid needless seizure, and deprivation, of their residents' vehicles;

(2)     Cities may obtain payment of outstanding citations—the very purpose of the municipal tows at issue—without having to

9

incur costs to tow and store vehicles (which often cannot be recouped);

(3)    Cities will reduce the amounts they incur for social services to support people who could otherwise use their cars for shelter and/or to obtain work; and

(4)    Cities may reduce the fees that they themselves incur by towing and later selling indigent people's cars.

These benefits come at minimal burden to cities. Advancements over the past three decades have made it not only practicable, but also virtually seamless for the government to give pre-tow notice. Indeed, cities all over America, including the City of Portland, already take advantage of such new technologies to collect parking payments, to sell tickets for public transportation, and to keep the public up to speed on public transportation schedules.[2] Thus, many cities, including the City of Portland here, would not even have to adopt or pay for new technologies to provide additional pre-tow notice.

Cash-strapped cities have an interest in parking enforcement, but they also have an obligation not to deprive their residents of property without due process of law. To do that, cities should employ notification procedures best designed to provide the pre-deprivation notice that the Constitution requires, to give their residents a chance to avoid incurring

---

[2] Cities also use technology to coordinate trash pickups, to allow residents to report hazards such as potholes, and to report graffiti. *See*, *e.g.*, Jackie Snow, *8 City Mobile Apps Driving Citizen Engagement*, SmartCitiesDive (May 18, 2017).

unnecessary debt, and also to save the cities money. The approach proposed by Appellant would enable cities to do just that.

On the other hand, affirming the district court's decision here would have potentially devastating effects for low-income and homeless individuals across the country, by creating binding precedent regarding the adequacy of notice without considering either the significant private interests at issue or the risk and resulting irreparable harm caused by erroneous deprivation of a vehicle.

### The California Experience: Municipal Tow Practices Often Result In The Permanent Deprivation Of Vehicles Owned By Low-Income And Homeless Individuals.

As a result of city policies authorizing vehicle tows to collect on municipal debts, cities across the country are permanently depriving low-income individuals of their vehicles (which often serve as their sole source of income or even their home) without adequate notice or opportunity to be heard.

Nearly a million vehicles are towed by government agencies in California each year. About 25% of those vehicles are towed for reasons related to poverty—such as unpaid parking and registration fees—rather than public safety. Lawyers' Committee for Civil Rights et al., *Towed into Debt: How Towing Practices in California Punish Poor People* 4 (2019) [hereinafter *Towed Into Debt*].

California Vehicle Code sections 22651(*i*) and (*o*) authorize local agencies to tow a car that (1) has received five or more parking citations that have gone unpaid for more than 21 days, or (2) has out of date registration. The statute further authorizes local parking authorities to retain the car until the vehicle owner presents proof that all outstanding citations have been paid, which often amounts to many thousands of dollars.

Current policy and practice in California has led to the loss of hundreds of thousands of vehicles, disproportionately prejudicing low-income Californians. *Towed into Debt*, *supra*, at 4. In addition to paying the underlying citations, to retrieve their cars, vehicle owners must also pay the full amount of tow and storage fees charged by the city. The average amount that a California vehicle owner must pay to retrieve a towed vehicle is $499, if the owner can pay within three days and does not owe parking or registration fees. *Id.* at 7. If the car is towed for unpaid tickets, the average retrieval cost doubles to over $1000. That figure balloons into many thousands of dollars in storage and other fees when a person cannot pay immediately. *Id*. Millions of American drivers are without the financial resources to make such payments to retrieve their vehicle after a municipal tow.[3] Indeed, for some, retrieving their car requires paying amounts that exceed the value of the seized vehicle.

---

[3] A 2018 Federal Reserve study found that four in ten adults would be unable to cover an unexpected $400 expense without selling something

The cost to retrieve a towed vehicle in San Francisco is so high that over half of the vehicles towed for unpaid tickets and registration were sold at lien sale, meaning owners lost their car entirely. *Towed Into Debt, supra*, at 25-26. Riverside County and San Diego report similar loss rates, with over 60% and 40% of vehicles towed for debt collection being sold at lien sale. *Id.* In short, the data shows that for a high percentage of low-income Californians, a municipal tow results in a permanent loss.

Worse, vehicle owners whose cars are sold at auction following a tow due to their inability to pay the corresponding fines and fees suffer further financial consequences and economic harm. Because cars sold through auction regularly sell for less than the amount of accrued storage charges incurred as a result of the tow, vehicle owners are still liable to repay to the city and tow facility any outstanding debt not covered by the sale of their vehicle. *See* Cal. Civil Code § 3068.2.

In addition, for vehicles purchased with financing, a tow is considered a breach of the sales contract. Such breach triggers repossession by the lender, which may retrieve the car from the tow yard to sell at its own auction—leaving the vehicle owner on the hook for

_____

or borrowing money. *Report on the Economic Well-Being of U.S. Households in 2017-May 2018* (Last updated June 19, 2018). *See also* David Sheff, *If You Want to See Inequality in the U.S. at Its Worst, Visit an Impound Lot*, Time (Aug. 26, 2014) (reporting that "a towed car, for example—can lead to a crippling spiral of stress, debt, joblessness, illness and, in many cases, incarceration").

both the tow charges and the deficiency balance on the loan, even though she no longer possesses the car. And, of course, a vehicle owner's failure to timely pay her outstanding debt to the city, or repay her vehicle loan, damages her credit—dramatically reducing the ability to buy another car or to rent or purchase a home.

Nor do cars sold at auction financially benefit the city. Municipalities and tow companies normally do not recoup enough money from the sale of the vehicle to cover the costs incurred to tow and store the vehicle, let alone the outstanding parking or registration fees. For example, San Diego accrues, on average, over $3,000 in tow and storage fees for each vehicle sold at lien sale. Yet the average sale price for these vehicles is about $565. *Towed into Debt*, *supra*, at 4, 14. In other words, the city loses money *and* vehicle owners are permanently deprived of their property. Everybody loses.

A car is a vitally important resource for individuals to obtain and maintain economic stability—it helps people get, and stay, employed. *Towed into Debt*, *supra*, at 15-16 ("Having regular access to a vehicle is one of the biggest factors in determining who will prosper in our economic system and who will be shut out of it."). Indeed, studies have found that (1) cars are more important than a high school diploma for

getting a job;[4] (2) lack of reliable transportation is the second biggest immediate barrier, after reliable child care, to finding employment;[5] (3) low-income people with access to a car are more likely to get off welfare;[6] and (4) access to a vehicle increases an employed individuals' wages over time.[7] The loss of a car reverses these benefits and leaves people unable to find and maintain employment.

These negative consequences are compounded for the sizable and growing population of individuals who cannot afford traditional housing and who rely on their cars as the sole place where they can escape the elements for a safe night's sleep.[8] *See, e.g.*, Jonathan Berr, *More*

---

[4] Paul M. Ong, *Car Ownership and Welfare-To-Work* 3 (2001), citing Paul Ong & Evelyn Blumenberg, *The Transportation Welfare Nexus: Getting Welfare Recipients to Work* 24-35 (1999).

[5] *Id.*

[6] Evelyn Blumenberg, Gregory Pierce, Michael Smart, Casey Dawkins, Jae Sik Jeon, Eli Knaap, Rolf Pendall, Christopher Hayes, Arthur George & Zach McDade, *Driving to Opportunity: Understanding the Links Among Transportation Access, Residential Outcomes, and Economic Opportunity for Housing Voucher Recipients* 3 (The Urban Inst. eds., 2014).

[7] Tami Gurley & Donald Bruce, *The Effects of Car Access on Employment Outcomes for Welfare Recipients*, 58 J. Urb. Econ. 250, 262 (2005).

[8] According to the Los Angeles Homeless Services Authority, in 2018, over 15,000 homeless people in the greater Los Angeles area lived in vehicles. *Vehicles, Tents, And Makeshift Shelters By Geographic Area* 4 (June 1, 2018). Recognizing the potential harm to this population, in 2014, this Court struck down a Los Angeles ordinance used to target homeless individuals living in their cars. *See Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1156-57 (9th Cir. 2014). The City of Los

*Americans are Forced to "Reside" in Their Vehicles*, CBS News (July 31, 2018) ("The number of people who live in their vehicles because they can't find affordable housing is on the rise, even though the practice is illegal in many U.S. cities. . . . The problem is 'exploding' in cities with expensive housing markets, including Los Angeles, Portland and San Francisco.")

For example, for one homeless San Franciscan, the tow of his vehicle for unpaid parking citations resulted in the loss of his job as a delivery driver for Postmates, Caviar, and UberEats, as well as the loss of his occasional shelter. That individual paid off as much of his outstanding debt as he could afford. Still, his vehicle was towed and held until he could pay over $10,000 charged by the City to retrieve it. He was thus left without the means to perform his job or an income, and forced to seek refuge at a homeless shelter. *Towed into Debt*, *supra*, at 16, 18; *see also*, *Smith v. Reiskin*, 2018 WL 7820727 at *1 (N.D.Cal., 2018).

In short, as this Court has recognized, municipal tow practices often create a "debt trap for the poor":

> Raising money for government through
> law enforcement whatever the source—parking
> tickets, police-issued citations, court-imposed
> fees, bills for court appointed attorneys,
> punitive fines, incarceration charges,

---

Angeles has since passed a new temporary ordinance prohibiting sleeping in cars. L.A. Mun. Code § 85.02.

> supervision fees, and more—can lay a debt
> trap for the poor. When a minor offense
> produces a debt, that debt, along with the
> attendant court appearances, can lead to loss of
> employment or shelter, compounding interest,
> yet more legal action, and an ever-expanding
> financial burden—a cycle as predictable and
> counterproductive as it is intractable.

*Rivera v. Orange County Prob. Dept.*, 832 F.3d 1103, 1112 n.7 (9th Cir. 2016).

Perhaps recognizing the potentially crushing effects of this policy on low-income and homeless individuals, San Francisco has created alternative payment options available to individuals who can show they are on public benefits. Eligible individuals may enroll in a low-income monthly payment plan or a community service plan to resolve outstanding parking-ticket debt. After a vehicle is towed, San Francisco waives its $283.75 administrative fee and three days of storage fees for qualifying low-income drivers, although they must still pay a $229 towing fee and any subsequent storage fees.

California law requires cities to offer payment plans to allow people with income under 125% of the federal poverty level to pay off parking citations. However, without prior notice of a tow for unpaid tickets, vehicle owners are not given the opportunity to enroll in such programs to prevent their cars from being seized. Some cities may allow drivers to enroll in a these payment plans after a tow. However, the plans

do not cover towing and storage fees, which must be paid before the vehicle is released.

**ARGUMENT**

**I      This Court Should Not Apply the *Mathews* Standard to Determine the Adequacy of Notice that Due Process Requires.**

      **A.      This Court should adopt the *Mullane-Jones* standard.**

As detailed in Appellant's opening brief, this Court should not affirm the district court's application of *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine the adequacy of notice that the government provides to vehicle owners before seizing a vehicle. *See* AOB at 21-23. The *Mathews* standard applies where the dispositive issue is the adequacy of a hearing, not the adequacy of notice provided by the government. *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 146 (4th Cir. 2014) ("Notice and the hearing are two distinct features of due process, and are thus governed by different standards.").

Here, because the sole question to be decided relates to the sufficiency of notice provided by the government, this Court should apply the framework set forth in *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) and *Jones v. Flowers*, 547 U.S. 220 (2006). *See Williams v. Mukasey*, 531 F.3d 1040, 1042 (9th Cir. 2008) (holding that the *Mullane* standard provides the framework to determine the adequacy of notice); *Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178, 1193 n.17 (9th Cir. 2015) (holding that the court would apply

18

the *Mullane* standard to determine a sufficiency of notice issue if it were
to review the case from the beginning); *State of Cal. ex rel. Lockyer v.
FERC*, 329 F.3d 700, 710 n.8 (9th Cir. 2003) (identifying the
circumstances that the *Mathews* standard would apply to); *Snider Int'l* ,
739 F.3d at 146 (holding that the *Mullane* standard is the appropriate
guide for determining the constitutional requirement of providing
notice).

 *Mullane* and *Jones* require the government to do more than just
provide notice via its standard procedures—instead, requiring that the
government take additional steps "to insure notice, if it is practicable to
do so" where the government knows that notice has been ineffective.
*Chin Yi Tu v. NTSB*, 470 F.3d 941, 945 (9th Cir. 2006).

 For example, in considering the adequacy of notice before a state
can extinguish a home owner's interest in his home, the Supreme Court
held that "the government's knowledge that notice pursuant to the
normal procedure was ineffective triggered an obligation on the
government's part to take additional steps to effect notice." *Jones*, 547
U.S. at 230, citing *Robinson v. Hanrahan*, 409 U.S. 38, 40 (1972)
(requiring the government to take additional practicable steps to give
notice of vehicle forfeiture proceedings where the State knew that the
property owner was in prison) and *Covey v. Town of Somers*, 351 U.S.
141 (1956). In so holding, the Supreme Court considered the
"practicalities and peculiarities of the case," including, that the case

19

concerned "such an important and irreversible prospect as the loss of a house." *Jones*, 547 U.S. at 230. Under this framework, "[t]he adequacy of a particular form of notice is assessed by balancing the State's interest against 'the individual interest sought to be protected by the Fourteenth Amendment.'" *Jones*, 547 U.S. at 221, citing *Mullane*, 339 U.S. at 314.

**B.    The *Mullane-Jones* standard requires the government to take practicable steps to ensure notice before seizing an indigent person's vehicle.**

The *Mullane-Jones* standard requires the government, in the context of low-income and homeless individuals who cannot afford to retrieve their vehicles once towed, to go beyond its standard, ineffective notice procedures by taking practical steps to insure effective notice. For example, such practicable steps may include requiring cities to consult existing electronic databases and mobile app platforms that they have access to. As Appellant has explained, many cities must already consult those platforms to determine if a vehicle is subject to tow in the first instance. The burden on the government to do so is minimal as compared to the individual interest sought to be protected.

Indeed, requiring the government to take additional practicable steps to improve the likelihood of effective notice is crucial to protect the individual interests of indigent persons who often cannot afford to retrieve their cars following a municipal tow, and for whom a tow may result in permanent deprivation of property. Such simple and practicable

efforts to provide actual notice would enable indigent vehicle owners

(1) to contest the propriety of the tow before the vehicle is seized; and

(2) to enroll in alternative payment options, including payment plans and

community service, to repay their outstanding debts without losing their

vehicles.

## II    Alternatively, the *Mathews* Standard Requires Cities to Do More Than Place a Ticket on a Window Before Seizing a Vehicle.

Should the Court apply the *Mathews* standard, that standard also

requires the government to do more than place a parking ticket on a

vehicle's windshield before seizing a vehicle for a minor, non-

emergency infraction. This is especially true in the context of a city

seizing a low-income or homeless individual's vehicle to collect a

municipal debt. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)

("Due process is flexible and calls for such procedural protections as the

particular situation demands.").

To resolve the constitutional sufficiency of notice provided to

individuals in this context, *Mathews* requires the Court to consider

(1) the important private interest in the retention of a vehicle; (2) the risk

to vehicle owners—and especially to homeless and low-income

owners—in being deprived of their vehicles and the value of the

requested additional procedural safeguards; and (3) the Government's

interest, including the fiscal and administrative burdens, implicated by

the proposed additional process. *Mathews*, 424 U.S. at 321; *see also*

*Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961) (requiring "a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action"). At the outset, this mandates consideration of the substantial private interests at stake in vehicular tows, *id.*, which heavily favors requiring the government to take additional, practicable steps to insure notice and an opportunity to be heard, *before* towing a vehicle.

**A.   Vehicle owners have an important private interest in the continued possession of their cars.**

This Court must consider the important private interest in continued retention of a vehicle in determining the level of due process owed before the government executes a tow. *Mathews*, 424 U.S. at 334 (internal citations omitted). A car is much more than a mere financial asset, and its deprivation may have severe and irreparable consequences, impacting the ability to obtain and maintain employment, to access education, and to get off welfare. *Towed into Debt*, *supra*, at 16-18.

This Court has held that the property right in a car is a substantial and important private interest. *See, e.g.*, *Scofield v. City of Hillsborough*, 862 F.2d 759, 762 (9th Cir. 1988) ("The uninterrupted use of one's vehicle [on public roads] is a significant and substantial private interest.") This interest is substantial regardless of the condition or value of the vehicle. *Soffer v. Cost Mesa*, 607 F. Supp. 975, 981 (C.D. Cal.

1985) ("A person's interest in his or her automobile is certainly significant"); *Wong v. City & Cty. of Honolulu*, 333 F. Supp. 2d 942, 954 (D. Haw. 2004) ("Whether a junk car has little or great value, it is constitutionally protected property.") The interest is amplified where a vehicle is a person's home, or only means for earning a livelihood.

First, such deprivation often prevents an individual from getting to work, performing their work, and supporting their family. "A person's ability to make a living and his access to both the necessities and amenities of life may depend upon the availability of an automobile when needed." *Stypmann v. San Francisco*, 557 F.2d 1338, 1342-43 (9th Cir. 1977). Today, most Americans depend on their vehicles to get to work, to perform their job duties (especially those who depend on their vehicles to participate in the "gig" economy, driving for companies like Uber, Lyft, and Postmates), to take their children to school, to go to medical appointments, and to engage in other basic activities of daily living. *Towed into Debt*, *supra*, at 16-18. The private interest in continued possession of a vehicle remains substantial and important, regardless of the value of the vehicle seized. *Soffer*, 607 F. Supp. at 981. It goes without saying that, without their vehicles (regardless of the value thereof), employed individuals cannot get to work, and unemployed individuals seeking work cannot look for employment. *Towed into Debt*, *supra*, at 16-18. In short, "an individual who cannot drive is at an extraordinary disadvantage in both earning and maintaining

23

material resources." *Robinson v. Purkey*, 326 F.R.D. 105, 156 (M.D. Tenn. 2018).

Public transportation is not a viable alternative to replace the important private property interest in a vehicle. Studies show that for many workers, getting to work without a vehicle would require making three or four transfers on public transportation. Margy Waller et al., *Driver's License Suspension Policies* 84 (Brookings Inst. 2005). (internal citations omitted). Studies have also shown that even in areas with public transportation, access to a car can help workers achieve a 40 hour workweek, adding an average of 9 hours per week to the number of hours worked and increasing wages by between $.70 and $2.06 per hour. Gurley & Bruce, *supra*, 58 J. Urb. Econ. at 265.

Without doubt, the private interest at stake in keeping possession of one's vehicle is of vital importance in the lives of most Americans. "Where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination, government may act without providing advance procedural safeguards." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 19 (1978). That is not the case in the instance of municipal tows, where deprivation of this property interest is permanent for the many drivers who cannot pay to retrieve their cars.

**B.    The risk of permanent deprivation of an important property interest favors additional practicable process.**

"An additional factor to be considered here is the fairness and reliability of the existing pre[deprivation] procedures, and the probable value, if any, of additional procedural safeguards." *Mathews*, 424 U.S. at 343. Advance procedural safeguards are not required "where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination[.]" *Memphis Light, Gas & Water*, 436 U.S. at 19. For example, in *Sackman v. City of Los Angeles*, 677 F. App'x 365 (9th Cir. 2017), this Court found "a low risk of erroneous deprivation because [the plaintiff] was able to contest the propriety of the citation and impound at administrative hearings and seek judicial review in state court."

That is not true for municipal tows, where deprivation is permanent for the many drivers who cannot afford to retrieve their cars. Without requiring local governments to take additional, practicable steps to insure notice before seizing a vehicle for minor, non-emergency and non-safety infractions, such as debt collection or parking meter enforcement, the risk of an erroneous permanent deprivation is great. Often those tows for the least urgent, debt collection-related reasons are most likely to end with a lien sale – meaning people who need their vehicles lose them entirely. *Towed into Debt*, *supra*, at 25-26.

25

As one California district court recently recognized, homeless individuals are "more vulnerable to the potential irreparable injury of continued unemployment and the harm associated with the deprivation of [their] personal effects and method of work and transportation." *Smith v. Reiskin*, 2018 WL 7820727 at \*4, citing *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1032 (9th Cir. 2012) ("for many of us, the loss of our personal effects may pose a minor inconvenience," that same loss "can be devastating for the homeless") For these individuals, the loss of a vehicle is a condemnation "to suffer grievous loss"—including, for some, the loss of their home. *Goldberg v. Kelly*, 397 U.S. 254, 262-63 (1970), citing *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring).

Current practices of providing notice to vehicle owners of an impending seizure by (1) mailing a parking citation, with small print indicating that vehicle may be subject to tow on the reverse, to a vehicle owner's registered address; or (2) placing the citation on the windshield of a vehicle, do not provide notice commensurate with the potential harms of deprivation that an indigent person may incur. Many individuals do not realize that a parking citation can lead so quickly to a tow. Further, mailed notices do not provide notice quickly, and indeed, a homeless vehicle owner may never receive either form of notice before being permanently deprived of their vehicle.

Such risk favors additional, practicable steps to insure notice and, crucially, an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"). Requiring cities to take practicable additional steps to insure notice before seizing a vehicle will do just that: It will allow vehicle owners to request and obtain a hearing to contest the basis for a tow in advance and to register for alternative payment options to repay their debts to the government offered by certain cities—thereby avoiding *any* deprivation of their vehicles.

The administrative process that Appellant proposes asks that Portland use information that is available through a parking app that the City already uses. Users of the app consent to contact through electronic means, including telephone, email, and text. Implementing a notice policy through the app already used by the City would allow the driver of a vehicle marked for tow to act proactively to reduce erroneous tows and to stop the accrual of unaffordable tow charges and administrative fees.

**C.**    **The administrative and fiscal burden on the city to provide adequate pre-tow notice is minimal and favors appellant.**

Because there is a "significant and substantial private interest" in "[t]he uninterrupted use of one's vehicle," *Scofield*, 862 F.2d at 762, "the

27

government must present a 'strong justification' for departing from the norm that the government must generally provide notice before towing a vehicle." *Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 584 F.3d 1232, 1238 (9th Cir. 2009), citing *Clement v. City of Glendale*, 518 F.3d 1090, 1094 (9th Cir. 2009). No such interest exists to obviate the need for additional practicable steps to insure notice before seizing an indigent person's vehicle.

1.   **The government interest in parking enforcement does not outweigh the important private interest in retention of a vehicle.**

Although local governments have a legitimate interest in ensuring compliance with parking regulations, *Scofield*, 862 F.2d at 762-63, citing *Sutton v. City of Milwaukee*, 672 F.2d 644, 648 (7th Cir. 1982)), that interest does not support a towing practice that skirts due process, permanently deprives individuals of their vehicles (which they may rely on for shelter and to perform their employment), and causes crushing hardships to a large percentage of extremely vulnerable vehicle owners. Indeed, it is beyond cavil that "[t]he state has no 'legitimate interest in building inescapable debt traps' for indigent residents." *People v. Dueñas*, 30 Cal. App. 5th 1157, 1171 n.8 (2019), citing *Thomas v. Haslam*, 329 F. Supp. 3d 475, 521 (M.D. Tenn. 2018).

Nor can local governments justify their current practices as a means of deterring illegal parking. *See Clement*, 518 F.3d at 1094

("having one's car towed, even one that's not operational, imposes significant costs and burdens on the car's owner," which "cannot be justified as a means of deterring illegal parking"). Particularly for the thousands of drivers whose cars are sold at auction, the use of a tow is a wholly disproportionate deterrent.

In addition to preventing unnecessary deprivations, the process that Appellant proposes would actually promote the government's parking enforcement interest. Contacting a driver through all available means—or at least those means of communication most likely to reach the driver—before towing increases the likelihood that owners will promptly follow parking laws by motivating the vehicle owner to move the cited vehicle if aware of an impending tow, thus clearing the roads of illegally parked vehicles.

## 2. The administrative and fiscal burden to take additional, practicable steps is minimal.

The administrative and fiscal burden to the government to take additional practicable steps pales in comparison to the potentially irreparable harm that may be forced upon indigent vehicle owners. Indeed, the adoption of new technologies by municipalities provides an entirely new calculus for the administrative burden of providing additional due process protections.

*First*, requiring local governments to use their existing databases and technology platforms to insure notice before seizing a vehicle will

29

impose only minimal burdens, if any. Many cities, including Portland, already take advantage of such platform to enforce parking restrictions, to collect parking payments, and to keep their residents informed of public transit schedules. Thus, many cities would not even have to adopt new technologies.

This minimal burden is readily distinguishable from the one that would have arisen had this Court ruled in favor of the plaintiff in *Sackman*, *supra*, 677 F. App'x 365—a case the district court relied on in granting summary judgment. There, the plaintiff sought to require the City of Los Angeles to change thousands of physical parking signs to provide notice of a 72-hour towing policy. *Id.* at 366 ("the posting of signs on every street would entail a substantial administrative and fiscal burden on the City"). Those are not the facts of this case.

Adopting Appellant's proposal here would not require the Portland to change any signs or adopt any new technologies. It would only require the Portland to consult an existing database—which it must consult to determine whether a car is parked illegally in the first place—to obtain additional contact information.

*Second*, current tow practices, for example those resulting in sale of an unclaimed vehicle, actually increase the financial burden on the government. Cities rarely recoup the costs of outstanding parking citations or the amount that they incur to tow and store an indigent person's vehicle. *See Towed into Debt*, supra, at 27; *see also*, Lawyers'

Committee for Civil Rights et al., *Paying More for Being Poor: Bias and Disparity in California's Traffic Court System* 7-8 (2017). In short, municipalities work against their own interests and incur additional costs when they get into the business of selling indigent people's cars for so little money that they still do not satisfy the cost of tow, storage, and outstanding parking citations.

## CONCLUSION

Under either the *Mullane-Jones* standard or the *Mathews v. Eldridge* balancing test, this Court should consider the impact of tows on the large number of drivers who cannot afford to recover their vehicles after a municipal tow. The Court must balance this deprivation against a city's interest in enforcing parking regulations and consider the relatively small burden on a municipality to provide pre-towing notice, particularly in a case such as this one where the steps to provide pre-tow notice are easy to undertake and represent a minimal administrative burden for the city. Accordingly, amici support Appellant's position that pre-tow notice is required by the Fourteenth Amendment. The impact on the private rights of drivers is far-reaching and not outweighed by a municipal interest in removing illegally parked vehicles.

March 25, 2019    MANATT, HELPS &PHILLIPS, LLP
          By: *s/Barry W. Lee*
          Barry W. Lee, Stephanie A. Roeser,
          and Noro Mejlumyan
          MANATT, PHELPS & PHILLIPS, LLP

          Rebekah Evenson and Claire Johnson Raba
          BAY AREA LEGAL AID

          Elisa Della-Piana and Jude Pond
          LAWYERS' COMMITTEE FOR CIVIL RIGHTS
          OF THE SAN FRANCISCO BAY AREA

*Counsel for Amici Curiae*
The San Francisco Coalition On Homelessness,
The Lawyers' Committee For Civil Rights Of The SF Bay Area,
and Bay Area Legal Aid

32

## CERTIFICATE OF COMPLIANCE

Counsel certifies that this Reply Brief uses 14-point Times New Roman type. According to Microsoft Office Word, this petition contains **5,568** words, including footnotes, which is within the 7,000 words permitted.

March 25, 2019      MANATT, HELPS &PHILLIPS, LLP
                    By: *s/Barry W. Lee*
                         *Attorneys for Amici Curiae*
                         The San Francisco Coalition on
                         Homelessness, Lawyers' Committee for
                         Civil Rights of the SF Bay Area, and Bay
                         Area Legal Aid


## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 25, 2019. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/Bess Hubbard*