No. 18-35673

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

ANDREW GRIMM,

*Plaintiff-Appellant*,

v.

CITY OF PORTLAND,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Oregon
No. 3:18-cv-00183-MO
Hon. Michael W. Mosman, United States District Judge

_____

## OPPOSED MOTION FOR JUDICIAL NOTICE

_____

Gregory Keenan
DIGITAL JUSTICE FOUNDATION
81 Stewart Street
Floral Park, New York 11001
(516) 633-2633
gregory@digitaljusticefoundation.org

*Attorney for Appellant Andrew Grimm*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

ARGUMENT ...........................................................................................1

    I.    THE FACTS INTRODUCED IN APPELLANT'S BRIEFS SHOULD BE
        JUDICIALLY NOTICED. ...........................................................1

        A.    Federal Rule of Evidence 201 sets forth the standard for
            judicial notice of adjudicative facts. ...........................................2

        B.    The facts introduced in Appellant's Briefs meet the standard
            set forth in Federal Rule of Evidence 201 for judicial notice.....8

        C.    Even if these facts did not meet the standard set forth in
            Federal Rule of Evidence 201, these facts are still
            appropriate for judicial notice independent of Rule 201. .........25

CONCLUSION .....................................................................................30

CERTIFICATE OF COMPLIANCE

EXHIBITS

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Aguilar v. ICE,
510 F.3d 1 (1st Cir. 2007)....................................................................6

Cannon v. District of Columbia,
717 F.3d 200 (D.C. Cir. 2013).........................................................21

Castillo-Villagra v. INS,
972 F.2d 1017 (9th Cir. 1992). .......................................................27

Clemmons v. Bohannon,
956 F.2d 1523 (10th Cir. 1992). .............................................. 10, 18

Colonial Leasing Co. v. Logistics Control Grp. Int'l,
762 F.2d 454 (5th Cir. 1985). ...........................................................2

Daggett v. Comm'n on Governmental Ethics,
205 F.3d 445 (1st Cir. 2000)...........................................................26

Daniels-Hall v. Nat'l Educ. Ass'n,
629 F.3d 992 (9th Cir. 2010). ...........................................................6

Denius v. Dunlap,
330 F.3d 919 (7th Cir. 2003). ....................................................5, 16

Dunagin v. Oxford,
718 F.2d 738 (5th Cir. 1983). .................................................. 26, 29

Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union,
544 F. App'x 657 (9th Cir. 2013)......................................................7

Kater v. Churchill Downs Inc.,
886 F.3d 784 (9th Cir. 2018). .......................................... 10, 16, 18

Lee v. City of Los Angeles,
250 F.3d 668 (9th Cir. 2001). ...........................................................3

Neaton v. Hartford Life & Accident Ins. Co.,
517 F. App'x 475 (6th Cir. 2013).....................................................5

Nipper v. Smith,
    39 F.3d 1494 (11th Cir. 1994). ...................................................7, 29

O'Toole v. Northrop Grumman Corp.,
    499 F.3d 1218 (10th Cir. 2007). ........................................ 5, 11, 16

Schering Corp. v. Bausch & Lomb,
    698 F.2d 862 (7th Cir. 1983). ..........................................................27

Siderius, Inc. v. M.V. "Amilla",
    880 F.2d 662 (2d Cir. 1989). ..........................................................25

Smith v. L.A. Unified Sch. Dist.,
    830 F.3d 843 (9th Cir. 2016). ..........................................................10

Stan Lee Media, Inc. v. Walt Disney Co.,
    774 F.3d 1292 (10th Cir. 2014). ......................................................13

Taleff v. Southwest Airlines Co.,
    554 F. App'x 598 (9th Cir. 2014). ...................................................10

Tollbrook, LLC v. City of Troy,
    774 F. App'x 929 (6th Cir. 2019). ...................................................13

Toth v. Grand Trunk R.R.,
    306 F.3d 335 (6th Cir. 2002). ..........................................................28

United States v. Alisal Water Corp.,
    370 F.3d 915 (9th Cir. 2004). ............................................................6

United States v. Amado-Nunez,
    357 F.3d 119 (1st Cir. 2004).......................................... 3, 26, 27

United States v. Bari,
    599 F.3d 176 (2d Cir. 2010). .............................................. 4, 5, 18

United States v. Bello,
    194 F.3d 18 (1st Cir. 1999)..............................................................28

United States v. Bervaldi,
    226 F.3d 1256 (11th Cir. 2000). .......................................................7

iv

United States v. Bowers,
    660 F.2d 527 (5th Cir. 1981). .........................................................................27

United States v. Brooks,
    715 F.3d 1069 (8th Cir. 2013). ..........................................................................4

United States v. Bryant,
    402 F. App'x 543 (2d Cir. 2010). ...................................................... 5, 16, 18

United States v. Dedman,
    527 F.3d 577 (6th Cir. 2008). ...........................................................................2

United States v. Gorny,
    655 F. App'x 920 (3d Cir. 2016). .....................................................................6

United States v. Hernandez-Fundora,
    58 F.3d 802 (2d Cir. 1995). ..................................................................... 25, 27

United States v. McCoy,
    No. 03:11-cr-00464-HZ,
    2016 U.S. Dist. LEXIS 119908 (D. Or. Sept 6, 2016). ................................13

Valdivia v. Schwarzenegger,
    599 F.3d 984 (9th Cir. 2010). .........................................................................23

Valley Broadcasting Co. v. United States Dist. Ct.,
    798 F.2d 1289 (9th Cir. 1986). ...................................................................4, 12

Von Saher v. Norton Simon Museum,
    578 F.3d 1016 (9th Cir. 2009). ................................................................ 12, 15

Werner v. Werner,
    267 F.3d 288 (3d Cir. 2001). ............................................................................4

Williams v. Empl'rs. Mut. Cas. Co.,
    845 F.3d 891 (8th Cir. 2017). ...........................................................................3

Zavala v. Wal-Mart Stores Inc.,
    691 F.3d 527 (3d Cir. 2012). .....................................................................4, 12

**Statutes**

42 U.S.C. § 1983. ...................................................................................23

**Other Authorities**

FRE 201 Advisory Comm. Notes. ............................................... 6, 27, 29

**Rules**

FRE 201(a). ................................................................. 1, 25, 27

FRE 201(b)............................ 1, 2, 3, 5, 6, 10, 11, 12, 13, 14, 15, 16, 18, 19, 21, 22

FRE 201(c). .................................................................................1, 2

## ARGUMENT

## I. THE FACTS INTRODUCED IN APPELLANT'S BRIEFS SHOULD BE JUDICIALLY NOTICED.

Adjudicative facts that are not subject to reasonable dispute must be judicially noticed where a party requests such notice. FRE 201(b), (c)(2); <u>see</u> Section I.A, *infra*.

Here, on appeal, Appellant Andrew Grimm introduced certain facts in his Opening and Reply Briefs. None of these facts are subject to reasonable dispute. Therefore, all of these facts are appropriate for judicial notice. <u>See</u> Section I.B, *infra*.

Even if this Court were to decide that these facts did not meet Federal Rule of Evidence 201's standard for judicial notice, these facts should still be judicially noticed. Federal Rule of Evidence 201 "governs judicial notice of an *<u>adjudicative</u>* fact only[.]" FRE 201(a) (emphasis added). In the alternative, these facts are background facts and legislative facts that are still appropriate for judicial notice, independent of the standard set forth in Federal Rule of Evidence 201. <u>See</u> Section I.C, *infra*.

Respectfully, this Court should take judicial notice of the facts introduced in the Opening and Reply Briefs.

1

### A.     Federal Rule of Evidence 201 sets forth the standard for judicial notice of adjudicative facts.

Federal Rule of Evidence 201 governs judicial notice of adjudicative facts. FRE 201(a).  Specifically, adjudicative facts that are not subject to reasonable dispute must be judicially noticed where a party requests such notice.  FRE 201(b), (c)(2).

There are three nuances of judicial notice that are sometimes overlooked.

**First**, judicial notice is about *facts*, not documents.  FRE 201(b).  Courts take "judicial notice of a *fact*[.]"  United States v. Dedman, 527 F.3d 577, 588 (6th Cir. 2008) (emphasis in original).

The first step in the analysis is identifying that fact precisely:

> The identity of the adjudicative fact of which the court intends to take notice is, of course, the threshold issue in examining the propriety of judicial notice.  Care should be taken by the court to identify the fact it is noticing, and its justification for doing so.  This is particularly necessary when a document, such as a court judgment, from which any number of distinct facts might be drawn, is the object of the notice.

Colonial Leasing Co. v. Logistics Control Grp. Int'l, 762 F.2d 454, 459 (5th Cir. 1985) (citations omitted).

A single document could serve as the basis for judicial notice of "the *fact* of the extradition hearing, the *fact* that a Waiver of  Extradition was signed […], [or] the *fact* that [a defendant] purportedly waived his right to challenge his

extradition[.]" Lee v. City of Los Angeles, 250 F.3d 668, 689-690 (9th Cir. 2001) (emphasis in original).

Merely discussing judicial notice of a *document*, however, is imprecise regarding which *fact* is at issue. For example, in one appeal, a party disputed judicial notice of a document, *i.e.*, "of the EPA fact sheet itself." Williams v. Empl'rs. Mut. Cas. Co., 845 F.3d 891, 904 n.6 (8th Cir. 2017). Yet, there, "the proper inquiry [wa]s whether the district court properly took judicial notice of the fact that Radium is a solid that emits alpha particles, not whether the district court properly took judicial notice of the *source* of that fact—the EPA fact sheet." Id. (emphasis in original).

Care should be taken not to confuse a document, one possible source of a fact, with a fact itself. Judicial notice is about the *fact*.


**Second**, judicial notice is appropriate under Rule 201(b) if *either* of "two tests" is met. United States v. Amado-Nunez, 357 F.3d 119, 121 (1st Cir. 2004); see FRE 201(b), (b)(1)-(2).

Under the *first* test in Rule 201(b)(1), a court must take judicial notice of an adjudicative fact if that fact "is generally known within the trial court's territorial jurisdiction[.]" FRE 201(b)(1). This first test for judicial notice encompasses

"matters of common knowledge." Zavala v. Wal-Mart Stores Inc., 691 F.3d 527, 546 (3d Cir. 2012).

For example, a court has taken judicial notice of the "accuracy and reliability of GPS technology." United States v. Brooks, 715 F.3d 1069, 1078 (8th Cir. 2013); see also United States v. Bari, 599 F.3d 176, 180 (2d Cir. 2010) (affirming district court's judicial notice that there are a plethora of different yellow rain hats available for sale online).

Newspaper articles may be useful to demonstrate that a fact is generally known because it has been "widely-publicized[.]" See Valley Broadcasting Co. v. United States Dist. Ct., 798 F.2d 1289, 1290 n.1 (9th Cir. 1986). Under the _first_ test, however, there is no need for a document to show that a fact is generally known.

Facts that are generally known need no proof. In fact, the concept of judicial notice first originated in the idea that not all facts need proof: "Judicial notice is one of the oldest doctrines of the common law, traceable to the ancient maxim, 'manifesta non indigent probatione.' ('That which is known need not be proved.')" Werner v. Werner, 267 F.3d 288, 300 n.1 (3d Cir. 2001) (Nygaard, J., dissenting in part).

4

Under the _second_ test in Rule 201(b)(2), a court must take judicial notice of a fact if that fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FRE 201(b)(2).

Under this second test, a source document functions as the "essential corroboration."  Denius v. Dunlap, 330 F.3d 919, 926 (7th Cir. 2003).  A source shows the fact to be "subject to ready, objective verification[.]"  United States v. Bryant, 402 F. App'x 543, 545 (2d Cir. 2010).

Thus, courts "commonly consult reference sources in order to better understand matters that are not typically common knowledge."  Neaton v. Hartford Life & Accident Ins. Co., 517 F. App'x 475, 486 n.16 (6th Cir. 2013).  Or, a court may conduct an "independent Internet search" to confirm a "common sense supposition."  Bari, 599 F.3d at 180.

There are certain situations where a source readily meets this second test for judicial notice:

- When one of the parties to a dispute is itself the source of the fact and does not explain why that fact is unreliable.  See, e.g., O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1225 (10th Cir. 2007) (granting judicial notice where party has not explained "why _its own_ website's posting of historical retirement fund earnings is unreliable" (emphasis added)).

- Where the source of the fact is a government website or public record. See, e.g., Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010) (judicially noticing information "made publicly available by government entities" with no dispute regarding authenticity or accuracy).

If an adjudicative fact meets either test, it is appropriate for judicial notice. FRE 201(b)(1)-(2).

**Third**, a "court may take judicial notice at any stage of the proceeding." FRE 201(d). Judicial notice may be taken "whether in the trial court or *on appeal*." FRE 201 Advisory Comm. Notes (emphasis added)

In this sense, judicial notice is "an exception to the usual rule" limiting appellate consideration of adjudicative facts to the record before the district court. Aguilar v. ICE, 510 F.3d 1, 8 n.1 (1st Cir. 2007). Through judicial notice, appellate courts can consider new facts "even though they were not presented to the District Court." See United States v. Gorny, 655 F. App'x 920, 925 n.5 (3d Cir. 2016).

Courts can even take judicial notice when it is requested "on the eve of oral argument[.]" United States v. Alisal Water Corp., 370 F.3d 915, 918 n.1 (9th Cir. 2004). They can take judicial notice of documents accessed or even created after

the district court's decision.  See, e.g., United States v. Bervaldi, 226 F.3d 1256, 1266 n.9 (11th Cir. 2000); Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union, 544 F. App'x 657, 658 n.1 (9th Cir. 2013).

Indeed, appellate courts have a "special need" to take judicial notice because appellate opinions bind more than just the parties:

> Appellate courts have a special need to resort to facts not found in the record.  When the question before the court is not merely the rights of the parties, but the interests of others who may be affected by the rule the court makes to govern the case, it would be foolish for the court to rely only on the evidence the parties have chosen to prove below.

Nipper v. Smith, 39 F.3d 1494, 1498 n.1 (11th Cir. 1994).

**B.** **The facts introduced in Appellant's Briefs meet the standard set forth in Federal Rule of Evidence 201 for judicial notice.**

The below-enumerated facts are appropriate for judicial notice under Federal Rule of Evidence 201.

<u>i. This Court should take judicial notice of the facts about Portland's use of SmartMeters and Portland's Smart City initiative.</u>

Portland *itself* is the source of the facts about its SmartMeters and its Smart City initiative.

All of the following facts are published (and publicized) on Portland's own government websites, each webpage of which bears the City of Portland's official seal:

1. The fact that "Parking Kitty is part of Portland's 'Smart City' initiative." Opening Br. at 6; <u>see</u> Ex. A, *infra*.

2. The fact that "[t]he 'Smart City' initiative centers on the government's commitment to using 'data and technology to improve people's lives' and to using 'data and technology responsibly.'" Opening Br. at 6; <u>see</u> <u>id.</u> at 57-58, 63; Ex. B, *infra*.

3. The fact that Portland "was 'one of the first large cities in North America to switch the majority of its meters' to SmartMeter technology." Opening Br. at 7, 57; <u>see</u> Ex. C, *infra.*

4. The fact that Portland "has installed 1,890 SmartMeters at a cost of $4,900 per meter." Opening Br. at 7; <u>see</u> Ex. C, *infra*.

5. The fact that "[s]ince adopting these new parking technologies 'meter revenues have risen dramatically.'" Opening Br. at 7; <u>see</u> Ex. C, *infra*.

6. The fact that Portland "has benefited from a '94 percent increase' in meter revenue since beginning its digital overhaul." Opening Br. at 7; <u>see</u> Ex. C, *infra*.

7. The fact that Portland's "digital overhaul 'makes maintaining and operating the parking meters more efficient' and that such digital technologies are 'easily upgradable.'" Opening Br. at 7; <u>see</u> <u>id.</u> at 61-62; Ex. C, *infra*.

8. The fact that Portland "itself was expressly seeking private partners as part of its SmartCity initiative." Reply Br. at 42; <u>see</u> Ex. D, *infra*.

None of these facts are subject to "reasonable dispute[.]" <u>See</u> FRE 201(b).

Facts published by governments are especially appropriate for judicial notice. Under Rule 201, "courts routinely take judicial notice of letters published by the government[.]" Smith v. L.A. Unified Sch. Dist., 830 F.3d 843, 851 n.10. (9th Cir. 2016). Courts take notice of a government's "press release[.]" Taleff v. Southwest Airlines Co., 554 F. App'x 598, 599 n.1 (9th Cir. 2014). Courts take notice from the whole spectrum "of official government publications[.]" Clemmons v. Bohannon, 956 F.2d 1523, 1532 n.2 (10th Cir. 1992).

In fact, this Court has taken judicial notice of a "slideshow, meeting minutes, and pamphlet *because* they [we]re publicly available on [a] *government website*[.]" Kater v. Churchill Downs Inc., 886 F.3d 784, 788 n.3 (9th Cir. 2018) (emphasis added).

Likewise, the facts here about Portland's SmartMeter program and Smart City initiative should be judicially noticed *because* they are publicly available on Portland's websites. All these facts can be "accurately and readily determined" from government websites. See FRE 201(b)(2).

The *only* way that these facts from government websites would *not* be appropriate for judicial notice under Rule 201 is if the government can reasonably dispute the "authenticity of the website" or the "accuracy of the information." See Kater, 886 F.3d at 788 n.3.

10

Here, that would be peculiar. These facts are _Portland's_ facts from _Portland's_ websites. Portland has not yet explained "why _its own_ website's posting" of these facts is unreliable. See O'Toole, 499 F.3d at 1225 (emphasis added).

Because these facts are found on _government_ websites, they are especially appropriate for judicial notice. Because Portland _itself_ is the source of these facts, it would be especially difficult for Portland to reasonably dispute them.

These facts from government websites are "not subject to reasonable dispute" here. See FRE 201(b). Certainly not by Portland.

### ii. This Court should take judicial notice of facts about the public-corruption and bribery scandal surrounding Portland's SmartMeter program.

Court documents and contemporaneous newspaper accounts verify the facts surrounding the public-corruption and bribery scandal in Portland's SmartMeter program.

The following facts related to that scandal are appropriate for judicial notice under Rule 201:

9. The fact that "Portland's SmartMeter program was [implicated] in a public-corruption investigation and bribery scandal." Reply Br. at 46; see Ex. E, _infra_.

11

10. The fact that "[f]ederal agents raid[ed] Portland parking offices in [a] public corruption investigation of [its] parking manager[.]"  Reply Br. at 47; see Ex. F, *infra.*

Both of Rule 201(b)'s tests show that neither fact is subject to "reasonable dispute[.]"  See FRE 201(b)(1)-(2).

Under Rule 201(b)'s *first* test, a court must take judicial notice of a fact if that fact "is generally known within the trial court's territorial jurisdiction[.]" FRE 201(b)(1).

Newspapers articles substantiate what is "generally known."  For example, a newspaper article demonstrates "the public awareness" of a fact.  See Valley Broadcasting, 798 F.2d at 1290 n.1 (9th Cir. 1986).  Newspaper articles "indicate what was in the public realm at the time[.]"  Von Saher v. Norton Simon Museum, 578 F.3d 1016, 1022 (9th Cir. 2009).

Here, an article from The Oregonian, a Portland-based newspaper, substantiates public awareness of the facts surrounding Portland's SmartMeter scandal.  See Ex. F.

Also, judicial notice for these facts is independently appropriate under the Rule 201(b)'s *second* test because these facts "can be accurately and readily determined" from court documents.  See FRE 201(b)(2).

Courts have taken judicial notice of facts verified by court records. <u>See</u> <u>Stan Lee Media, Inc. v. Walt Disney Co.</u>, 774 F.3d 1292, 1298 n.2 (10th Cir. 2014). Specifically, courts have taken judicial notice of "indisputable court actions, such as the entry of a guilty plea[.]" <u>Tollbrook, LLC v. City of Troy</u>, 774 F. App'x 929, 936 n.5 (6th Cir. 2019).

Portland's SmartMeter scandal resulted in a guilty plea by Portland's former Parking Operations Manager. <u>United States v. McCoy</u>, No. 03:11-cr-00464-HZ, 2016 U.S. Dist. LEXIS 119908, *1 (D. Or. Sept 6, 2016). Portland's parking manager "pleaded guilty to a Superseding Information charging him with conspiring to pay and accept bribes, accepting bribes, and filing false income tax returns." <u>Id.</u>; <u>see</u> Ex. E.

Under both of Rule 201(b)'s tests for judicial notice, judicial notice of these facts is appropriate. <u>See</u> FRE 201(b)(1)-(2).

### iii. This Court should take judicial notice of the facts about Portland's mobile Parking Kitty app.

Portland's *own* mobile Parking Kitty app is the source of the facts about the app.

13

Indeed, both of the following facts are readily verified by downloading Portland's Parking Kitty app and initiating the registration process for Parking Kitty:

11. The fact that Portland's Parking Kitty app asks "How should we contact you?" when a user registers for the app. Opening Br. at 10-11; <u>see</u> Ex. G, *infra*.

12. The fact that, during registration, Portland's Parking Kitty app states "We use your phone number to identify you in our system[.]" Opening Br. at 10-11; <u>see</u> Ex. G, *infra*.



Neither fact is subject to "reasonable dispute[.]" <u>See</u> FRE 201(b)(1)-(2).

14

Under the _first_ test, a court must take judicial notice of a fact if that fact "is generally known within the trial court's territorial jurisdiction[.]" FRE 201(b)(1).

These facts about Parking Kitty are generally known in Portland, Oregon. On a day-to-day basis, drivers in Portland use Portland's Parking Kitty app to pay for street parking. In order to use Parking Kitty, drivers must download and complete the registration process. The above screenshot is part of that registration process.

Everyday citizens parking their cars on Portland streets know these facts. They know that Parking Kitty offers to contact them. They know that Parking Kitty does in fact contact them via their smartphones. These facts are generally known in Portland, just as it is generally known that coin-operated meters take quarters.

In addition, documents in the record detail how much Portland promoted its Parking Kitty app as well some of the app's coverage in local newspapers. <u>See</u> ER 31-41. These record documents "indicate what was in the public realm at the time[.]" <u>See</u> <u>Von Saher</u>, 578 F.3d at 1022 (9th Cir. 2009).

These facts are not only common knowledge. <u>See</u> FRE 201(b)(1). They are also "accurately and readily determined" from Portland's _own_ app. <u>See</u> FRE 201(b)(2). Thus, these facts are appropriate for judicial notice under either test.

15

These facts are publicly available via Portland's app.  As noted above, this Court has taken judicial notice of a "slideshow, meeting minutes, and pamphlet *because* they [we]re publicly available on [a] *government website*[.]"  Kater, 886 F.3d at 788 n.3 (emphasis added).

Here, the facts about Portland's Parking Kitty app should be judicially noticed *because* they are publicly available on Portland's app.  Indeed, the *only* way that these facts from a government app would *not* be appropriate for judicial notice under Rule 201(b) is if the government can reasonably dispute the "authenticity of the website" or the "accuracy of the information."  Kater, 886 F.3d at 788 n.3.

Again, that would be peculiar.  These facts are *Portland's* facts from *Portland's* app.  Portland has not explained why "*its own*" app's information is unreliable.  See O'Toole, 499 F. 3d at 1225 (emphasis added).

Furthermore, these facts are "subject to ready, objective verification[.]"  See Bryant, 402 F. App'x at 545.  Actually downloading the app itself and completing the registration process would provide "essential corroboration."  See Denius, 330 F.3d at 926.  Anyone with a smartphone could verify these facts about Portland's app.

For all these reasons, these facts from a government app are "not subject to reasonable dispute" here.  See FRE 201(b).

iv. This Court should take judicial notice of the facts about Boston's NoTow notifications.

Like the facts from Portland's websites and Portland's app, the facts about Boston's NoTow notifications are verifiable from publicly accessible government websites.

Indeed, all of the following facts are published on Boston's government websites:

13. The fact that there is a tow-notification service called NoTow that was "created by the City of Boston, Massachusetts in 2007." Reply Br. at 39, see Ex. H, *infra*.

14. The fact that Boston's NoTow notification service "offers email, text, and auto-dialer alerts for towed vehicles." Reply Br. at 39-40; see Ex. I, *infra*.

15. The fact that Boston's NoTow notification service "provides alerts for 'cars towed for street cleaning, unpaid tickets, snow emergencies, as abandoned, and by Boston Police Department directive.'" Reply Br. at 41; see Ex. I, *infra*.

None of these facts are subject to "reasonable dispute[.]" See FRE 201(b).

Again, facts published by governments are especially appropriate for judicial notice. Courts take judicial notice from the whole spectrum "of official

17

government publications[.]" <u>Clemmons</u>, 956 F.2d at 1532 n.2. Indeed, this Court has taken judicial notice of facts "*because* they [we]re publicly available on [a] *government website*[.]" <u>Kater</u>, 886 F.3d at 788 n.3 (9th Cir. 2018) (emphasis added).

Here, these facts about Boston's NoTow notification service should be judicially noticed *because* they are publicly available on Boston's government websites. All these facts can be "accurately and readily determined" from government websites. <u>See</u> FRE 201(b)(2).

Indeed, the <u>*only*</u> way that these facts from Boston's websites would <u>*not*</u> be appropriate for judicial notice under Rule 201(b) is if Portland could reasonably dispute the "authenticity of the website" or the "accuracy of the information." <u>Kater</u>, 886 F.3d at 788 n.3.

Yet by viewing Boston's government websites, these facts are "subject to ready, objective verification[.]" <u>See</u> <u>Bryant</u>, 402 F. App'x at 545. These NoTow facts can be easily confirmed by an "independent Internet search" at the following Boston websites, <u>see</u> <u>Bari</u>, 599 F.3d at 180:

- https://www.cityofboston.gov/towing/alerts/

- https://www.cityofboston.gov/oldnews/Default.aspx?id=3678

- https://www.cityofboston.gov/towing/alerts/faq.asp

Thus, these facts from government websites are "not subject to reasonable dispute[.]" <u>See</u> FRE 201(b).

<u>v. This Court should take judicial notice of the fact that Retriever Towing had an F rating from the Better Business Bureau.</u>

The following fact is readily verifiable by reviewing a screenshot of the Better Business Bureau's website (as accessed on July 25, 2019):

16. The fact that Retriever Towing, the tow company that Portland used to tow Mr. Grimm's car, had an F rating from the Better Business Bureau. Reply Br. at 45-46, <u>see</u> Ex. J, *infra*.

The Reply Brief included a screenshot of the Bureau's website displaying the F rating that Retriever Towing had at that time:



As of the filing of this Motion, the Better Business Bureau now gives

Retriever Towing an NR rating.  See Retriever Towing, Better Business Bureau

(last accessed Sept. 29, 2019), https://www.bbb.org/us/or/portland/profile/towing-

company/retriever-towing-1296-61000273.

On its website, the Better Business Bureau describes what this rating means:

In some cases, BBB will not rate the business (indicated by an NR, or
"No Rating") for reasons that include insufficient information about a
business or ongoing review/update of the business's file.

Overview of Ratings, Better Business Bureau (last accessed Sept. 29, 2019),

https://www.bbb.org/overview-of-bbb-ratings.

In the case of Retriever Towing, the Better Business Bureau notes that Retriever Towing "is in the process of responding to previously closed complaints." Reasons for Rating, Better Business Bureau (last accessed Sept. 29, 2019), https://www.bbb.org/us/or/portland/profile/towing-company/retriever-towing-1296-61000273/overview-of-bbb-ratings

Retriever Towing had an F rating. It currently has no rating because of pending responses to customer complaints. The fact of these ratings can be readily and accurately determined by reviewing the screenshots of the websites in the Exhibits. See Cannon v. District of Columbia, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking notice of a website's contents).

### vi. This Court should take judicial notice of the fact that City Attorney Reeve is an active supporter of social justice.

Like many of the facts above, Portland *itself* publishes the following fact on its government website, a website which also bears the City of Portland's official seal:

17. The fact that Portland City Attorney Tracy Reeve is an "active supporter" of "social justice issues[.]" Reply Br. at 42-43; see Ex. K, *infra*.

This fact is not subject to "reasonable dispute[.]" See FRE 201(b).

This fact is especially appropriate for judicial notice for all the reasons provided about facts from Portland's government websites: (1) that this fact is publicly available on a government website; (2) that this website is Portland's *own* website; and (3) that this website is subject to ready verification by any person with an internet connection.

This fact from a government website is "not subject to reasonable dispute[.]" See FRE 201(b).


### vii. This Court should take judicial notice of the fact that Mr. Grimm's car was towed at 9:24 a.m. on December 21, 2017.

The following fact is readily verified by a document created by a government agent in the ordinary course of its business:

18. The fact that Mr. Grimm's "car was towed at 9:24 a.m." Reply Br. at 17, see Ex. L.


This fact is not subject to "reasonable dispute[.]" See FRE 201(b).

This Motion has already established, at length above, that facts from government documents are especially appropriate for judicial notice. See Sections I.B.i, iii-iv, vi, *supra*. This document identifying that the car was towed at 9:24 a.m. is a government document.

22

This document is the document of a government agent. Retriever Towing towed Mr. Grimm's car at the behest of the government itself. Retriever Towing created the document in the ordinary course of conducting business for the government, *i.e.*, acting "under color of" law when creating the document. See 42 U.S.C. § 1983.

Also, documents in the record support the veracity of Retriever Towing's listed tow time of 9:24 a.m. on December 21, 2017. The parking officer's last ticket was issued at 8:35 a.m. that day. ER 59. Portland has also admitted that a tow was requested that day after this 8:35 a.m. ticket and that Retriever Towing responded to the government's tow request. Answer, ER 72 ¶ 89; cf. Compl., ER 91 ¶ 89.

Thus, this 9:24 a.m. timeframe for the tow coheres with the documents in the record.

The only way that this document would not be appropriate for judicial notice is if Portland reasonably challenged the authenticity or accuracy of the document. Valdivia v. Schwarzenegger, 599 F.3d 984, 994 (9th Cir. 2010) (concluding "judicial notice was proper" where the "authenticity of [documents] was not challenged by either party").

As of yet, Portland has given no reason to think that its towing agent falsified a document.  Thus, this fact too is appropriate for judicial notice. <u>See</u> FRE 201(b).

* * * * *

All the foregoing facts are appropriate for judicial notice under Federal Rule of Evidence 201.

**C.  Even if these facts did not meet the standard set forth in Federal Rule of Evidence 201, these facts are still appropriate for judicial notice independent of Rule 201.**

All facts introduced in the Opening and Reply Briefs are appropriate for judicial notice under Rule 201.  See Section I.B, *supra*.

In the alternative, even if this Court were to decide that a fact does not meet *either* of Rule 201's tests, that fact would still be appropriate for judicial notice. Independent of Rule 201, each fact is appropriate for judicial notice as a background fact or legislative fact.

"It is axiomatic that Rule 201 of the Federal Rules of Evidence deals only with judicial notice of adjudicative facts."  Siderius, Inc. v. M.V. "Amilla", 880 F.2d 662, 666 (2d Cir. 1989) (internal quotations omitted).  Other types of facts are "unregulated" by the Rule.  See id.

The Rule says so expressly.  Rule 201 "governs judicial notice of an adjudicative fact only[.]"  FRE 201(a).  Therefore, "only notice of [adjudicative facts] is subject to the strictures of Rule 201."  United States v. Hernandez-Fundora, 58 F.3d 802, 812 (2d Cir. 1995) (noting that Rule 201 is "frequently (albeit erroneously) cited" in cases involving judicial notice of non-adjudicative facts).

25

Other facts—background facts and legislative facts—are appropriate for judicial notice without reference to Rule 201. Indeed, courts take notice of such facts all the time.

Take legislative facts. Legislative facts are facts that help courts to establish legal rules and "usually are not proved through trial evidence but rather by material set forth in the briefs[.]" Daggett v. Comm'n on Governmental Ethics, 205 F.3d 445, 455 (1st Cir. 2000) (citing FRE 201 Advisory Comm. Notes). Legislative facts concern "social factors and happenings[.]" Dunagin v. Oxford, 718 F.2d 738, 748 n.8 (5th Cir. 1983).

Appellate courts take notice of legislative facts often, regardless of whether they are in the record. It is the policy consequences of appellate litigation that explain why "legislative facts are often considered and cited by the Supreme Court with or without introduction into the record or even consideration by the trial court." Id.

There are also background facts.

"Rule 201(b)'s limits do not apply to the vast array of 'background' facts commonly considered by judges and juries in deciding cases." Amado-Nunez, 357 F.3d at 121. "These 'background' or 'evaluative' facts cover the whole range of human experience from the rough meaning of common terms ('city') to science (a

full moon illuminates a scene) to human psychology  (a witness who is related to one of the parties might be biased)." Id. at 121-122.

A judge does _not_ use such facts "as a substitute for evidence, but rather as background information to help her interpret the evidence before her."  See Schering Corp. v. Bausch & Lomb, 698 F.2d 862, 865 (7th Cir. 1983).  Indeed, Rule 201's limitation to adjudicative facts recognizes that judges don't need to check "their knowledge and experience of life at the courthouse door." Castillo-Villagra v. INS, 972 F.2d 1017, 1026 (9th Cir. 1992).

To the contrary, Rule 201 intended "the use of _non-evidence_ facts to appraise or assess the _adjudicative_ facts of the case."  FRE 201 Advisory Comm. Notes (emphasis added).

In sum, facts that do "_not_ change from case to case" are non-adjudicative facts.  United States v. Bowers, 660 F.2d 527, 531 (5th Cir. 1981) (emphasis added).  For these "nonadjudicative facts[,]" Rule 201's limitations do not apply. FRE 201 Advisory Comm. Notes.  Because Rule 201 only limits judicial notice of adjudicative facts, Rule 201's restriction on judicial notice "turns on the characterization of the fact judicially noticed." Hernandez-Fundora, 58 F.3d at 812; FRE 201(a).

27

There is no hard and fast rule. "Whether a fact is adjudicative or legislative depends _**not**_ on the nature of the fact […] but rather on the use made of it […] and the same fact can play either role depending on context." United States v. Bello, 194 F.3d 18, 22 (1st Cir. 1999) (emphasis added); Toth v. Grand Trunk R.R., 306 F.3d 335, 349 (6th Cir. 2001) (either role depending on the "manner in which it is used").

Here, even if the facts introduced in the Opening and Reply Briefs did not meet either of Rule 201(b)'s tests, these facts should still be judicially noticed. These facts, in the alternative, can function as background facts or legislative facts that are not subject to Rule 201.

For example, take the facts related to Boston's NoTow notification service. See Section I.B.iv, *supra*. In one sense, these facts are adjudicative: they are probative of how practicable it would be to provide digital tow notifications. In another sense, these facts are background facts: they provide context that some cities provide digital tow notifications.

Likewise, the remaining facts introduced in the Opening and Reply Briefs can function as adjudicative, legislative, _or_ background facts. It depends on how this Court uses them: in the formulation of a legal principle (legislative fact), as context for the case (background fact), or to examine factual disputes (adjudicative fact).

28

Even if this Court does not conclude that a particular fact meets Rule 201's requirements, that fact is still appropriate for judicial notice to function in the formulation of legal principles and to apprise this Court about the "social factors and happenings" that pertain to this appeal.  See Dunagin, 718 F.2d at 748 n.8 (5th Cir. 1983).

Moreover, it is important that this Court consider these facts as it decides this appeal.  The issues on appeal go well beyond Mr. Grimm's individual tow. See Opening Br. at 57-74; see generally Amicus Br.

Indeed, this Court has a "special need to resort to facts not found in the record" because this appeal affects "the interests of others who may be affected by the rule the [C]ourt makes to govern the case[.]"  Nipper, 39 F.3d at 1498 n.1 (11th Cir. 1994).  It would be "foolish" not to take judicial notice where the rights of non-parties are at stake.  Id.

Rule 201's drafters had similar concerns in mind when limiting the scope of Rule 201 to adjudicative facts.  Indeed, legislative and background facts are the "facts most needed in thinking about difficult problems of law and policy[.]" FRE 201 Advisory Comm. Notes  (quoting, with approval, a legal scholar on this issue).  If such facts were ignored, then "judge-made law would stop growing[.]" Id.

29

# CONCLUSION

This Court should take judicial notice of the facts introduced in Appellant's Briefs.

Date: October 4, 2019                     Respectfully submitted,

                                          DIGITAL JUSTICE FOUNDATION

                                          */s/ Gregory Keenan*
                                          Gregory Keenan
                                          81 Stewart Street
                                          Floral Park, NY 11001
                                          (516) 633-2633
                                          gregory@digitaljusticefoundation.org

                                          *Attorney for Appellant Andrew Grimm*

## CERTIFICATE OF COMPLIANCE

This Motion contains **5153** words, excluding the portions of the Motion

exempted from word counts.

This Motion has been prepared in a proportionately spaced typeface using

Times New Roman 14-point font in Microsoft Word.

Date: October 4, 2019                              Respectfully submitted,

DIGITAL JUSTICE FOUNDATION

*/s/ Gregory Keenan*
Gregory Keenan
81 Stewart Street
Floral Park, NY 11001
(516) 633-2633
gregory@digitaljusticefoundation.org

*Attorney for Appellant Andrew Grimm*

31

# Exhibit A

a

[https://www.portlandoregon.gov/transportation/69999](https://www.portlandoregon.gov/transportation/69999)





c



d

# Exhibit B

e

https://www.smartcitypdx.com





f

# Exhibit C

https://www.portlandoregon.gov/brfs/article/157993

 **City of Portland Green Purchasing Case Study**

## Solar-Powered Parking Meters

### Purchasing Green

In 2002, the Portland Bureau of Transportation (PBOT) began replacing the city's 7,100 single-space parking meters with multi-space, solar-powered SmartMeters. SmartMeters are located in the middle of blocks, and each meter serves an average of six to seven parking spaces. The user can pay with coins, debit or credit cards, pre-paid Smart Cards, or by using Portland's payment app, Parking Kitty.

The city now has 1,890 active SmartMeters. Portland was one of the first large cities in North America to switch the majority of its meters to this technology.

### Benefits

Each six-foot SmartMeter features a 10-watt solar panel that recharges the meter's sealed lead acid batteries. This technology requires ambient light only, allowing meters to operate efficiently even on cloudy, rainy days.

Unlike traditional coin meters, whose 9-volt alkaline batteries need to be replaced annually, the batteries in SmartMeters are rechargeable and last 5-7 years. PBOT recycles both kinds of batteries, but since SmartMeters' batteries last significantly longer and serve multiple spaces, using SmartMeters reduces the City's overall disposal costs and environmental impact.

The wireless technology employed by SmartMeters makes maintaining and operating the parking meters more efficient. The old meters filled up quickly and were constantly jamming. Often there was a long lag time between a meter being out-of-service and PBOT becoming aware of the situation. SmartMeters allow proactive rather than reactive maintenance, immediately notifying PBOT of technical problems. PBOT formerly averaged about four calls per space annually due to money jams; now it's less than one. Additionally, SmartMeters are easily upgradeable and require limited tools when being serviced.

While most of the time SmartMeters print a paper receipt to display in the vehicle's curbside window as proof of payment, PBOT is exploring new technologies that eliminate the need for paper receipts. Pay by Plate meters allow people to purchase parking time at a meter by entering their license plate number. The Pay by Plate meters sync with Parking Enforcement handheld devices so officers can verify payments. Similarly, Parking Kitty app payments can be viewed electronically through Parking Enforcement handheld devices. In both instances, paper receipts are not required, reducing paper waste and printer maintenance costs



*SmartMeters use solar panels specially designed to work in cloudy, rainy climates.*

## At a glance –

**Who –**
- Portland Bureau of Transportation

**Product –**
- Solar-powered parking meters

**Cost –**
- $4,900 per meter
- Decreases maintenance costs
- FY17-18 revenue 94% higher than FY02

**Benefits –**
- Solar-powered
- Simplifies & reduces maintenance
- Reduces coin collections, saving gas

1

h

> *"The City of Portland continues to maintain all bankcard security standards by participating in annual security reviews. This helps to insure that all customer transaction data is protected."*
>
> Doug Siemens,
> Pay Station System Analyst,
> City of Portland Bureau of
> Transportation

## Cost

As of June 2016, each SmartMeter costs $4,900, compared to $650 for a new single-space meter. Although this may seem like a big price difference, the fact that SmartMeters serve an entire block of parking spaces, increase collection revenue, and reduce maintenance costs means they are extremely cost competitive with a block of single space meters.

Meter revenues have risen dramatically since the installation of the SmartMeters. In FY17-18, the meters generated about $36 million, a 94 percent increase in revenue compared to 2002, the last year the City used the old meters exclusively. PBOT attributes this increase in part to the SmartMeters' ability to accommodate credit/debit cards. In fact, credit/debit cards account for 78 percent of transactions, which greatly reduces trips to collect coins, saving gas in the process.

## Performance

PBOT has experienced no major failures with the SmartMeters. Besides Portland, other U.S. cities using similar technology include Chicago, IL; Denver, CO; Seattle, WA; and Washington DC.

## Lessons Learned

PBOT devoted a lot of resources to employee and public education, an investment that led to a smooth transition to the new technology. Employees were trained in how to maintain and service the SmartMeters. To assist the public, PBOT distributed brochures and stationed "Meter Greeters" at new installation sites.

■ December 2018 (v6)

### About Portland Bureau of Transportation (PBOT)

*The Bureau of Transportation maintains the $13 billion investments in infrastructure facilities from streets and structures to traffic signals and street lights. PBOT is a community partner in shaping a livable city. We plan, build, manage and maintain an effective and safe transportation system that provides people and businesses access and mobility. We keep Portland moving.*

For more information: *Doug Siemens, Pay Station System Analyst, City of Portland Bureau of Transportation, 503-823-0015.*

i

# Exhibit D

https://www.smartcitypdx.com/private-sector-partners







m



n



O

# Exhibit E

United States v. McCoy

## *United States v. McCoy*

United States District Court for the District of Oregon

September 6, 2016, Decided; September 6, 2016, Filed

No. 03:11-cr-00464-HZ

**Reporter**
2016 U.S. Dist. LEXIS 119908 *; 2016 WL 4639150

UNITED STATES OF AMERICA, Plaintiff, v. ELLIS K. McCOY, Defendant.

### Core Terms

sentencing, trips, emails, Bribe, Chart, ineffective, plea hearing, misrepresentations, records, sentencing hearing, parking meter, travel, smart, plea agreement, defense team, continuance, assistance of counsel, prejudiced, deficient, vacation, argues, meals, Superseding, conspiracy, calculate, expenses, prison, guilty plea, probation, contents

**Counsel:** [*1] For the United States: Billy J. Williams, UNITED STATES ATTORNEY, District of Oregon, Seth D. Uram, ASSISTANT UNITED STATES ATTORNEY, Portland, Oregon.

Ellis K. McCoy, Defendant, Pro se, Sheridan, Oregon.

**Judges:** Marco A. Hernandez, United States District Judge.

**Opinion by:** Marco A. Hernandez

### Opinion

OPINION & ORDER

HERNANDEZ, District Judge:

On August 30, 2012, Defendant pleaded guilty to a Superseding Information charging him with conspiring to pay and accept bribes, accepting bribes, and filing false income tax returns. ECF 15, 18. He was sentenced on May 27, 2015. ECF 44. A Judgment of Conviction, and an Amended Judgment of Conviction, were filed on May 28, 2015. ECF 56, 58.

Defendant moves to vacate or correct his sentence under *28 U.S.C. § 2255*. In connection with the motion, he moves for appointment of counsel. For the reasons

explained below, no evidentiary hearing is required and the motion is denied. Defendant's motion for appointment of counsel is also denied.

I. Ineffective Assistance of Counsel

In his Plea Agreement, Defendant expressly "waive[d] the right to file any collateral attack, including a motion under *28 U.S.C. § 2255*, challenging any aspect of the conviction or sentence on any grounds, except on grounds of ineffective assistance of counsel, [*2] and except as provided in *Fed. R. Crim. P. 33* and *18 U.S.C. § 3582(c)(2)*." ECF 20. During the plea hearing, Defendant confirmed, under oath, that he had read the Plea Agreement and understood it. ECF 22/Attach. 1 to Gov't Resp. 18, ECF 73-2 ("hereinafter "Plea Hearing"). He stated he had no problems understanding anything in the document. *Id.* at 7. Consistent with the Plea Agreement, Defendant's *§ 2255* motion is based only on an assertion that his counsel was ineffective. His challenge is limited to counsel's representation of him in connection with the sentencing phase. More specifically, he focuses on documents and information provided by the Government in its Sentencing Memorandum which were disclosed to Defendant shortly before sentencing and which Defendant alleges contained false and misleading information.

II. Standards for Ineffective Assistance of Counsel Claims

Courts use a two-part test to determine whether a defendant has received constitutionally deficient assistance of counsel. *Premo v. Moore, 562 U.S. 115, 121, 131 S. Ct. 733, 178 L. Ed. 2d 649 (2011)*. Under this test, a defendant must prove that counsel's assistance was deficient *and* that the deficient performance prejudiced the defense. *Id.*; see also *Schurz v. Ryan, 730 F.3d 812, 815 (9th Cir. 2013)* (Defendant must show not only that counsel's performance was deficient but that the deficient [*3] performance prejudiced the defendant), cert. denied, 135 S. Ct. 141, 190 L. Ed. 2d 106 (2014).

United States v. McCoy

To prove the deficiency of counsel's performance, the defendant must show counsel made errors so serious that his "'representation fell below an objective standard of reasonableness'" under prevailing professional norms. *Stanley v. Cullen*, 633 F.3d 852, 862 (9th Cir. 2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). The court must inquire "whether counsel's assistance was reasonable considering all the circumstances" at the time of the assistance. *Strickland*, 466 U.S. at 688.

In assessing whether counsel's performance was deficient, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and make every effort 'to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Hibbler v. Benedetti*, 693 F.3d 1140, 1149 (9th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689). Ultimately the defendant's "burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the *Sixth Amendment*.'" *Harrington v. Richter*, 562 U.S. 86, 104, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (quoting *Strickland*, 466 U.S. at 687).

"To satisfy the prejudice prong under *Strickland*, a defendant must show 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Saesee v. McDonald*, 725 F.3d 1045, 1048 (9th Cir. 2013) (quoting *Strickland*, 466 U.S. at 694). "'A reasonable probability [*4] is a probability sufficient to undermine confidence in the outcome.'" *Saesee*, 725 F.3d at 1048 (quoting *Strickland*, 466 U.S. at 695).

The court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant[.]" *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." Id.

III. Factual Background

A. The Plea Phase

In November 2011, Defendant was charged in a one-count Information with accepting bribes in violation of *18 U.S.C. § 666*. ECF 1. He made his first appearance on December 8, 2011 at which time Assistant Federal Public Defender Thomas Price was appointed to represent him. ECF 5. Price represented Defendant throughout the entry of Judgment.

At the time of the offense conduct, Defendant worked for the City of Portland's Bureau of Transportation as the Parking Operations Manager and then the Transportation Division Manager. The offense conduct involved taking bribes in connection with the City's installation of "smart" parking meters.

In August 2012, Defendant was charged in a five-count Superseding Information. ECF 15. Count One alleged a conspiracy to pay and accept bribes in violation of *18 U.S.C. § 371*. Id. Count Two [*5] alleged the acceptance of bribes in violation of *18 U.S.C. § 666*. Id. Counts Three through Five alleged the filing of False Income Tax Returns for tax years 2006, 2007, and 2008, in violation of *26 U.S.C. § 7206(1)*. Id. Defendant waived indictment and pleaded guilty to all charges in an August 30, 2012 plea hearing. A that time, he admitted, under oath, that he had been advised concerning the nature of each charge and the elements of each charge. Plea Hearing 8. He admitted that he was satisfied with the aid and advice provided by his lawyer throughout "this process." Id. at 9. He later stated that his guilty plea was not the result of force, threat, or intimidation. Id. at 21.

As to the bribery-related conduct charged in the Superseding Information, Defendant agreed that the following facts were true:

> Counts one and two. [The Plea Petition] says you were employed as a - - at the Transportation Division Manager Parking Operations, Portland Bureau of Transportation, Portland, Oregon. Your primary responsibility was for the day-to-day operation of the City of Portland's Smart Parking meter program.
>
> The City of Portland's Bureau of Transportation was a government agency that received in each calendar year federal benefits and/or federal [*6] assistance in excess of $10,000. It says from approximately May 2002 through July 2011 you accepted and agreed to accept the bribes described in the superseding information from individuals identified in the superseding information as executive number one and executive number two.
>
> It goes on to say that you agreed to accept and accepted those bribes intending to be influenced and rewarded in connection with the business of and transactions of the City of Portland's Bureau of Transportation relating to the City of Portland's Smart Parking meter program.

Id. at 21-22.

United States v. McCoy

The "bribes described" in the Superseding Information include the following allegations:

5. From approximately January 2002 through July 2011, defendant Ellis K. McCoy, being an agent and employee of the city of Portland Bureau of Transportation, Executive #1, and Executive #2, combined, conspired and agreed to corruptly give (Executive #1 and Executive #2) and be influenced and/or rewarded (McCoy) in connection with the business of, and the transactions of, the City of Portland's Bureau of Transportation, a thing of value of $5,000 or more, relating to the City of Portland's smart parking meter program, in violation of Title *18, United States Code, Section 666*.

6. It was [*7] part of the conspiracy that in 2002 and continuing to July 2011, Executive #1 paid some or all of the travel, lodging, meals, and greens fee expenses associated with golf trips defendant Ellis K. McCoy took to golfing destinations, including to Pebble Beach, California.

7. It was part of the conspiracy that beginning in 2002 and continuing to July 2011, Executive #1 paid some or all of the travel, lodging, meals, and other expenses associated with gambling trips defendant Ellis K. McCoy took to casinos, including casinos located in Las Vegas, Nevada.

8. It was further part of the conspiracy that beginning in 2003 and continuing to July 2011, Executive #1 paid for some or all of the travel, lodging, and meals expenses associated with vacation trips by defendant Ellis K. McCoy, including vacation trips to New Orleans, Louisiana, Honolulu, Hawaii, and Paris, France.
* * *

12. It was further part of the conspiracy that Executive #1 made payments to defendant Ellis K. McCoy in return for defendant McCoy speaking favorably about the products and services of Company #1 and, later, Company #1A to public employees in cities other than Portland involved in the decision about which companies to use [*8] to supply products and services relating to smart parking meters.
* * *

15. It was further part of the conspiracy that in return for the payments from Executive #1 and Executive #2, defendant McCoy, acting in his capacity as the Transportation Division Manager, Parking Operations, Portland Bureau of Transportation, assisted Executive #1 and

Executive #2 in securing for their respective companies contracts and contract expansions with the City of Portland for products and services related to the City of Portland's smart parking meter program. Such assistance took the form of, among other actions: 1) providing advice to Executive #1 and Executive #2 concerning the drafting of contract proposals to be submitted to the City of Portland; 2) participating in the drafting and submitting of reports and recommendations to the Portland City Council concerning city action in awarding contracts to Company #1 and Company #1A, and 3) testifying before the Portland City Council in favor of awarding contracts and contract expansions to Company #1 and Company #1A, each such instance of assistance being a separate overt act.
* * *

17(b). In July 2003, Executive #1 paid the expenses associated with a three-day [*9] trip to France for defendant McCoy[:]
* * *

17(d). From approximately June 2002 and continuing to July 2011, Executive #1 paid some or all of the travel, lodging, meals, and other expenses associated with golfing trips, gambling trips, and vacation trips for defendant Ellis K. McCoy, each such payment being a separate overt act.

ECF 15; see also id. at ¶¶ 9-11, 13-14 (alleging that Executive #1 made payments to McCoy ).

At the plea hearing, Defendant agreed that these allegations were true statements. Plea Hearing 22. He agreed he "[d]id . . . those things[.]" Id.

As part of the plea hearing, I asked the Government to explain the elements of the crimes and what evidence the Government would have relied on if the case had gone to trial. Id. at 23. In response, the Government discussed the elements and then explained that it would offer documentary and testimonial evidence. Tr. 23-24. The documentary evidence would include records seized from Defendant's office and home, records of activity from his bank accounts, records from the City, records obtained from the company identified as 1A, bank records and credit card records of Executive #1, and certain public records. Id. at 24-25. Testimonial evidence would include [*10] witnesses from the City, the FBI agent who conducted the investigation, an FBI financial analyst, and an IRS agent. Id. at 25-26. Based on the evidence and financial analysis, the Government intended to show that the total amount of check and

United States v. McCoy

cash payments Defendant received from Executive #1 and Executive #2 was approximately $164,500. Id. at 29.

The Government's representation that the check and cash payments equaled approximately $164,500 was based on the parties' stipulation in the Plea Agreement that "[t]he defendant and the government agree that the total bribe amount pursuant to sentencing guideline section 2C1.1 is $164,567 paid in checks and currency plus the value of travel, meals, lodging, and other expenses of an undetermined amount." Plea Agrmt. ¶ 7. The parties further agreed that "the total bribe for sentencing guidelines calculation purposes is less than $200,000." Id. Based on that stipulation, the Plea Agreement contemplated, as to Counts 1 and 2, a base offense level of fourteen, plus an additional two levels for more than one bribe, and an additional ten levels for the amount involved being somewhere between $120,000 to $200,000. Id. at ¶ 9. In the Plea Agreement, the Government agreed to recommend the low end [*11] of the applicable sentencing guideline range. Id. at ¶ 12.

At the Plea Hearing, I confirmed with Defendant that the amount at issue for the bribe-related charges was $164,567, and for guideline purposes, was less than $200,000. Plea Hearing 18. Defendant understood what that meant. Id. He had no questions about the calculation of offense levels as provided in the Plea Agreement. Id. I also confirmed with Defendant that ultimately, I would determine his sentence. Id. at 13. He had no questions about that issue. Id.

At the conclusion of the plea hearing, Defendant pleaded guilty to each of the five counts. Id. at 31-32. I found that the plea was given freely and voluntarily and I accepted the plea. Id. at 32. I set sentencing for November 26, 2012. Id.

B. The Sentencing Phase

Based on the parties' joint request, sentencing did not occur until May 27, 2015. Before the sentencing hearing, the Government submitted a Sentencing Memorandum with several exhibits. ECF 52. Defendant also submitted a comprehensive Sentencing Letter which was shared with the Government but not docketed. The Government amended its Sentencing Memorandum to correct an error. ECF 54.

The exhibits attached to the Government's Sentencing Memorandum consisted [*12] of emails and a few text

messages between McCoy and George Levey[1] or between Levey and executives with his company, spanning from March 2005 to mid-2011. Gov.'t Sent. Mem., Exs. 1-28 (hereinafter "the Levey emails"). They were offered to show Defendant's manipulation of the contract process in favor of Levey's company, how Defendant protected Levey's company from complaints of poor performance, and how Defendant advocated for Levey's company when talking to parking meter managers in other cities.

One part of the Government's Sentencing Memorandum addressed the travel, entertainment, and meal bribes. Gov't Sent. Mem. 4-6. Based on the parties' agreement that the cash and check bribes totaled $164,567 and the additional agreement that the total amount was less than $200,000, the Government represented that McCoy agreed that he took bribes in the form of travel, entertainment, and meals of not more than $35,400 total. Id. at 4. The Government's description of these bribes began with the assertion that shortly after the City awarded its first contract for smart parking meters in early 2002 to Schlumberger, the company which employed [*13] Levey as its United States smart meter sales representative, Levey took McCoy, an avid golfer, on a golfing trip to a resort in Phoenix to reward McCoy for Schlumberger getting the $6.8 million contract. Id. The Government then asserted that over the next nine years, McCoy and Levey traveled together frequently, with Levey usually paying some or all of McCoy's travel expenses, meals, and entertainment. Id. After Levey worked for Schlumberger, he then incorporated Cale Parking Systems, US, established its headquarters in Florida, and became its president and owner. Id. at 3. Sometimes, Levey paid for McCoy to travel without him, and sometimes to promote Cale, Schlumberger's competitor. Id. at 3, 4.

The Government listed sixty-one of "these trips" in a table (hereinafter the "Trip Bribe Chart"). Id. at 4-6. The Government identified the trips from emails between McCoy and Levey, from records seized at Levey's company, from Levey's credit card statements and other financial records, and from McCoy's financial records. Id. at 4. The table included, for each trip, the trip date, the trip location, and the amount that Levey or his company paid. Id. The Government specified actual amounts for only six of the trips. Id. at 4-6. The amounts [*14] for the other fifty-five trips are listed as unknown. Id. Several of the trips listed by the

---

[1] Levey was identified as Executive #1 in the Superseding Information.

United States v. McCoy

Government were to places Defendant had previously agreed were part of the offense conduct. See id. (July 29, 2002 trip to Paris; August/September 2002 trip to Pebble Beach; July 2003 trip to New Orleans; August 2003 trip to Honolulu; and trips to Las Vegas in 2003, 2004, 2006, 2008, and 2010).

According to an Affidavit submitted by Price in response to Defendant's § 2255 motion, on May 12, 2015, the Government notified Defendant's counsel that it would be introducing new email evidence at Defendant's sentencing hearing. Gov't Resp. to Def.'s § 2255 Mot., Ex. 3 ("Price Affid.") at 4. The Government provided copies of the Levey emails to Defendant's counsel on May 18, 2015. Id. Price states that he emailed the Government's counsel, contending that the emails should have been provided much earlier. Id. He also raised a question as to whether or not a continuance was warranted or whether the material should be stricken from consideration at sentencing. Id. In response, the Government's attorney told Price that the FBI had only recently provided the emails to him. Id. Defendant has no records of this communication [*15] between Price and the Government's attorney. He asserts that Price's statement about sending an email inquiring about a continuance is not credible. Def.'s Reply 10, ECF 77.

Price explains that after reviewing the Levey emails, he concluded that their contents were not inconsistent with what the defense team, including Defendant, had already understood and concluded: that Defendant had influenced the process that resulted in Cale obtaining the winning bid for the smart parking meter contract. Price Affid. 5. Price states that he discussed the matter with the defense team, further researched the issue, discussed the matter with other attorneys in his office, and talked to Defendant. Id. They decided to stick with their previously-agreed upon sentencing strategy. Further, Price asserts that on May 20, 2015, Defendant had the opportunity to review the emails in a two-hour meeting. Id. at 7. Defendant remembers discussing only one of the emails at that meeting. Def.'s Reply 10.

Price asserts that in the May 20, 2015 meeting, and in another two-hour meeting on May 26, 2015, the defense team and Defendant agreed to stick to the May 27, 2015 sentencing date, and to adhere to their strategy which was [*16] designed to try to keep Defendant out of prison. Id. at 7. The strategy was to focus on the fact that Defendant sincerely believed in the product and wanted to achieve the best service for the best price for the City. Id. They intended to show a lifetime of Defendant's positive character and his efforts at rehabilitation and reform. Id. They also did not want to refute what was already conceded. Id.

At the sentencing hearing, I interrupted the Government's attorney to clarify the value of the bribes. The following exchange occurred:

> THE COURT: It's my understanding the value of the cash was around $164,000 and some change. Am I right about that?
>
> MR. URAM: Yes, Your Honor.
>
> THE COURT: And then the value of all the wining and dining and vacation and golf trips and all that was not - - you weren't able to determine it, but did I see a number of around $35,000 in there for at least part of that?
>
> MR. URAM: What you saw, Your Honor, was a reference to the plea agreement, where we have stipulated that the total bribe amount - - pardon me, - - is not more than $200,000. And that means that if the cash and check bribes were about $164,000, all the wining and dining and trips can't be more than approximately [*17] $35,000.
> We were able to calculate much less - - document much less based on the reports we put together. And that's shown in the chart that starts, I think, on page 4 of our sentencing memo.
>
> THE COURT: And when you say you were able to calculate less, that's because there were actual receipts and stuff, and that's what you were able to calculate. And then for the others, there was a lot of unknown how much was spent. And I take it those were left out of the math.
>
> MR. URAM: That's correct.
>
> THE COURT: So what you stipulated to was - - and there were a lot of trips and dinners and all that other stuff, just based on some gross estimate, that it was less - - because of the $200,000 limit, you're just guessing what that number might be. It could be more; it could be less.
>
> MR. URAM: The way you put it, yes. But we stipulated that it was a total of less than $200,000 because if we can't prove it, the benefit of the doubt goes to the defendant, in my view. And so we arrived at what I believe was a fair stipulation based on what we had available to us.
>
> THE COURT: All right. Thank you.

ECF 59/Attach. 2 to Gov't Resp. 7-8, ECF 73-4 (hereinafter "Sent. Hearing").

Price, consistent with the defense team [*18] strategy, opened his remarks by stating that Defendant's

"character and circumstances warrant a sentence of probation, and that is what we will be asking for." Id. at 11. He noted that Defendant was a "profoundly different person" than he was four years earlier and that he had consistently taken responsibility for his conduct. Id. He also remarked that as much as Defendant "influenced the process, which we admit he did - - and it was an unfair, tainted process, which we admit - - he did always endeavor to get the best deal he could for the City." Id. at 12. In regard to the trips, Price stated:

> A number, and a significant number of the trips that the Government referred to between pages 2 and 6 of its memo include trips that the City of Portland paid for. Some of those unknown numbers are City of Portland trips. Some of those unknown numbers are duplicates with the other information. Some of those unknown numbers are also trips that Mr. McCoy paid out of his own pocket.

Id.

During Defendant's allocution, Defendant explained that he was motivated by his desire to make the parking program successful and sustainable, he worked hard at his job, and he "rationalized that I could continue my close relationship [*19] with vendors as long as I demanded and received positive results for Portland." Id. at 25. Continuing, he explained that "[s]ome of those relationships included, you know, taking trips, but I paid for the majority of those vacations back and forth down to see them, because I considered them mistakenly, friendships." Id. at 12-13.

After the conclusion of remarks by the Government, Price, and Defendant, I sentenced Defendant to twenty-four months on Count 1 and on Count 2, to be served concurrently with the sentence imposed on Count 1. Id. at 32. The Sentencing Guideline range for Count 1 was forty-six to fifty-seven months. Id. The Government sought a thirty-month sentence. Id. I concluded that a twenty-four month sentence was sufficient but not longer than necessary to accomplish the goals of sentencing. Id. I also sentenced Defendant to twelve months on each of Counts 3, 4, and 5, with all of that time to be served concurrently with the sentences imposed on Counts 1 and 2. Id.

### IV. Discussion

Defendant raises three separate grounds for relief. First, he contends that Price was ineffective for failing to obtain more time to evaluate the Levey emails which were disclosed shortly before the sentencing hearing. Def.'s § 2255 Mot. 5, ECF [*20] 60; Def.'s § 2255 Mem.

2-3. Second, he alleges that Price was ineffective for allowing the Court to consider, at sentencing, evidence that was prejudicial to Defendant. Id. at 6; Def.'s § 2255 Mem. 3-7. Third, he alleges that Price was ineffective for refusing to accede to Defendant's request during the sentencing hearing to respond to the Government's information and my questions about the Trip Bribe Chart. Id. at 7; Def.'s § 2255 Mem. 7-8.

#### A. Ground One: Failure to Seek Additional Time

Defendant argues that Price was constitutionally ineffective for failing to seek a continuance of the sentencing hearing to allow the defense team more time to review and consider the Levey emails and the Trip Bribe Chart. The parties agree that Defendant met with counsel to review the emails on May 20, 2015, although Defendant states he remembers discussing only one of the emails. Defendant does not dispute that the defense team met again and discussed the emails again, on May 26, 2015. Defendant challenges Price's assertion that he emailed the Government's counsel upon initially receiving the Government's Sentencing Memorandum with the Levey emails and the Trip Bribe Chart, to discuss the late disclosure of the emails and to discuss [*21] a possible continuance. For the purposes of this motion, I assume the facts in Defendant's favor and proceed on the assumption that Price did not discuss a possible setover with the Government.

Putting aside Defendant's mistaken reference to the Federal Rules of Civil Procedure, Defendant is correct that Price could have requested a setover of the May 27, 2015 sentencing hearing. See Fed. Rule Crim. P. 32. But, Price is correct that a setover would not have affected the admissibility of the Levey emails or the Trip Bribe Chart. See, e.g., United States v. Lizarraga-Carrizales, 757 F.3d 995, 1000 (9th Cir. 2014) ("sentencing courts are not limited to evidence that would be admissible at trial"), cert. denied, 135 S. Ct. 1191, 191 L. Ed. 2d 145 (2015); United States v. Vanderwerfhorst, 576 F.3d 929, 935 (9th Cir. 2009) ("Hearsay evidence of unproved criminal activity not passed on by a court . . . may be considered in sentencing.") (internal quotation marks and brackets omitted); United States v. Felix, 561 F.3d 1036, 1042 (9th Cir. 2009) (noting that the Sentencing Guidelines provide that "[i]n determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial," and that a court may consider any information, "so long as it has sufficient indicia of reliability to support its probable accuracy" (citing U.S.S.G. § 6A1.3, Cmt.); further stating that "a sentencing judge may consider a wide variety of

United States v. McCoy

information [*22] which would not be considered admissible at trial.") (internal quotation marks and brackets omitted).

Although Defendant argues that the failure to seek a continuance prejudiced him, he does not deny that the defense team's overall strategy at sentencing was to keep him out of prison by focusing on the following: (1) his actions were motivated by a desire to benefit the City; (2) the City suffered no financial harm; (3) his conduct was aberrant when considered in the context of a lifetime of hard work and professionalism; (4) he was remorseful and had reformed; and (5) he suffered from an illness which would be hard to treat in prison. See, e.g., Price Affid. 5-6 (describing that they decided to focus on positive aspects of Defendant's lifelong character, that "his course of conduct was an aberration from his lifelong pattern of hard work and professionalism," that Defendant had strived to achieve the best product at the best price for the City, and that he was remorseful and had reformed); Sent. Hearing 4 (Government attorney noting that a "fair amount" of Defendant's request for probation was based on Defendant's medical condition).

It is undisputed that Defendant was concerned about [*23] the timing of the disclosure of the Levey emails and their contents. He was also concerned about the Trip Bribe Chart and its alleged over-representation of the number of trips that were paid for in whole or in part by Levey. See Def.'s § 2255 Mot. & Mem., Ex. 2 (email exchanges between Defendant and Price regarding inaccuracies). However, as Price explains, in his opinion, the contents of the emails were not inconsistent with what the defense team had already understood and concluded - that Defendant had influenced the process that resulted in Cale obtaining the winning bid for the smart parking meter contract. Price Affid. 5. Moreover, Price was concerned that engaging in a dispute or argument about the details of the Levey emails would not only undermine the sentencing strategy, but could negatively affect the parties' agreement for a reduction in offense level calculations for acceptance of responsibility. That is, because challenges to the contents of the emails could viewed as effectively attacking the very conduct to which Defendant had already pleaded guilty, Price was justifiably concerned about the impact such challenges could have on sentencing. See Price Affid. 6 ("My defense [*24] team and I wanted to avoid arguing about the emails because to do so would tend to contradict facts Mr. McCoy had already admitted. . . . We had already conceded [the fact of his involvement in

influencing the process to ensure Cale won the contract] as part of Mr. McCoy's plea agreement. We also believed delaying sentencing would provide no strategic benefit to Mr. McCoy.").

Considering all of the evidence, Price's decision not to challenge the contents of the emails was not unreasonable. In analyzing an ineffective assistance of counsel claim, an attorney's strategic decisions are given deference, and it is not for this Court to second guess those decisions. Strickland, 466 U.S. at 689; Elmore v. Sinclair, 799 F.3d 1238, 1250 (9th Cir. 2015) (explaining that "[a]s long as defense counsel uses a 'sound trial strategy,' employing that strategy does not constitute deficient performance"; rejecting arguments which were "little more than a challenge to [defense counsel's] trial strategy with the benefit of hindsight"), pet. for cert. filed, (U.S. Jan. 27, 2016) (No. 15-7848); see also Zapien v. Martel, 805 F.3d 862, 872 (9th Cir. 2015) ("strategic choices made after thorough investigation of the law and facts . . . are virtually unchallengeable") (internal quotation marks omitted). Price reviewed the emails, consulted his [*25] defense team, talked to his client, and weighed the pros and cons of attacking them. The risks he assessed were more than speculative. His strategy was within the range of reasonable decisions competent counsel would consider. Given Price's decision not to dispute the emails, there was no need to seek a continuance. As Price states, he had sufficient time to prepare for sentencing, including examining the new evidence. Thus, his decision to not seek a continuance of the sentencing hearing for purposes of further evaluating the Levey emails was not ineffective.

Moreover, Defendant's argument that he was prejudiced by Price's conduct in this regard misses the mark. Defendant states that Price did not give him the time to counter the misrepresentations contained in the emails. Def.'s Reply 11. This assertion is belied by the emails exchanged between Defendant and Price from May 21, 2015 to May 25, 2015 in which Defendant refers to inaccuracies in the Government's Sentencing Memorandum. It is also belied by the fact that there are only twenty-eight emails, many with only a few sentences, and at least two of which Defendant sent or received. Thus, it should not have taken more than a couple [*26] of hours to review the emails and assess them for inaccuracies. However, for the purposes of this motion, I accept Defendant's assertion that he did not have adequate time to counter the emails. But, the only prejudice asserted as a result of that alleged lack of time is that Price failed to respond to the content of the

emails to correct alleged misrepresentations and did not allow Defendant to "counter the misrepresentations of the last minute email evidence[.]" Def.'s Reply 11 (arguing that the Government's characterizations were inaccurate and were misrepresentations). This argument is essentially the same argument Defendant raises in support of Ground Two: that Price allowed the Court to consider the evidence at sentencing. I address the argument below, in discussing Ground Two.

As to the Trip Bribe Chart, the record shows that despite not seeking a continuance, Defendant was able to provide Price with information as to which trips were part of the bribe conspiracy and which were not. Def.'s § 2255 Mot. & Mem., Ex. 2 (emails from Defendant to Price from May 21, 2015 to May 25, 2015 providing information); Id. at 9 (attached chart to May 25, 2015 email); Id., Ex. 3 (copy of chart created by Defendant [*27] including information on each of the sixty-one trips included in the Trip Bribe Chart). Thus, the record fails to establish that Price's failure to seek a continuance on the basis of the Trip Bribe Chart prejudiced Defendant's ability to provide accurate information to Price or prejudiced Price's ability to use that information.

B. Ground Two: Allowing the Court to Consider Prejudicial Evidence

Defendant argues that Price was ineffective for not addressing the Trip Bribe Chart and the Levey emails at sentencing. Defendant argues that by allowing me to consider the evidence, several misrepresentations in the Government's Sentencing Memorandum were left unchallenged. As a result, he asserts that various misrepresentations of fact prejudiced him at sentencing.

Defendant's arguments lack merit. First, as explained in the previous section, Price made a strategic decision to focus on other arguments in support of a sentence of probation. He correctly assessed the Levey emails as consistent with the facts and scheme to which Defendant had already pleaded guilty. He correctly assessed that the details of the trips as outlined in the Trip Bribe Chart were generally irrelevant as long as the Government [*28] adhered to the $200,000 monetary limit. It was reasonable for Price to forego contesting what Defendant alleges were misrepresentations in order to keep the Court's attention on the arguments that had a greater chance of persuading the Court to impose a sentence of probation.

Second, Price did raise the issue of inaccuracies in the Trip Bribe Chart in his sentencing presentation. Sent

Hearing. 12 (expressly referring to the Trip Bribe Chart at pages two through six of the Government's Sentencing Memorandum and explaining that the trips included trips paid for by the City, paid for by Defendant himself, or duplicates of other bribe information). Thus, he did, in fact, bring those alleged misrepresentations to the Court's attention.

Additionally, Defendant's argument concerning the alleged misrepresentations in the Levey emails is actually directed to the Government's interpretation of those emails and what they purportedly show. In his Reply Memorandum, Defendant cites to page twelve of the Government's Sentencing Memorandum and the statement made by the Government there that "[i]n September 2005, McCoy required Cale to sign an extension to its free trial, but he did this not to benefit Portland, [*29] but to benefit Levey and Cale." Gov't Sent. Mem. 12 (cited at Def.'s Reply 11). In support of this statement, the Government quoted from a September 16, 2005 email from Levey to Cale's senior executives in Sweden. Id. (citing to Gov't Sent. Mem., Ex. 3). Defendant argues that in fact, Cale did not receive a benefit from the contract extension and instead, all the benefit went to the City which received financial benefit from the pilot program. Def.'s Reply 11. Defendant offers his interpretation of events and asserts that the Government misrepresented that he was not working for the City. Id.

In another example, Defendant cites to a statement by the Government in its Sentencing Memorandum that the "last documented instance of McCoy trying to help Cale obtain a contract with the City of Portland came in June 2011." Gov't Sent. Mem. 18. In support, the Government cited to a June 22, 2011 text message sent by Levey which referred to Ellis and Ellis's plan to wait on the application, then write an "RFP" to support it which would be the "start we need" and be "[i]ncentive enough to get launched." Id. (citing Gov't Sent. Mem., Ex. 18). Defendant argues that the references here are to charging stations [*30] and cell phone payment capabilities and that pay station "RFP's" are "designed to encourage the vendors to provide the City with future enhancements that work with their pay stations['] proprietary software." Def.'s Reply 11. Defendant argues that the Government's statement in its Sentencing Memorandum is a misrepresentation.

The problem here is that Defendant does not argue that the Levey emails themselves were inaccurate or contained misstatements of fact. Defendant's issue is with how the Government made use of the Levey emails

United States v. McCoy

in its Sentencing Memorandum. The Sentencing Memorandum is, however, argument. It is the Government's interpretation of the underlying facts. In reviewing a Sentencing Memorandum, the Court is aware that it is a non-neutral expression of advocacy. That Price did not expressly challenge the Government's construction of the chain of events cannot be viewed as unreasonable given that Defendant did not dispute the authenticity of the Levey emails or the accuracy of their contents. Price recognized that some of the details of the scheme as outlined by the Government in reliance on the Levey emails were insignificant given that Defendant had already admitted his [*31] participation in the scheme and that the scheme lasted through July 2011. This recognition was consistent with a decision by competent, not incompetent, counsel. Further, Defendant's own Sentencing Letter spent considerable time arguing that although Defendant accepted bribes, he was always motivated by a desire to obtain the best deal for the City. I was well aware of Defendant's position on this issue.

Third, Defendant argues that he was prejudiced, but he offers no evidence in support of this assertion. As noted above, the guideline range was forty-six to fifty-seven months. The Government recommended thirty months. Defendant received twenty-four months, about one-half of the low end of the guideline range. If Defendant is suggesting that without the Levey emails or the Trip Bribe Chart he would have received less prison time, he is wrong.

At the sentencing hearing, I clarified that the Government was unable to prove the value of the trips other than approximately $35,000, the difference between the $164, 587 in admitted cash/check bribes, and the $200,000 ceiling. I also confirmed that the Government was able to actually calculate less than $35,000. I noted that there were a lot [*32] of trips, but I ensured that the Government was just "guessing what the number might be. It could be more; it could be less." Sent. Hearing 8. This, combined with Price's representation that the Trip Bribe Chart was over-inclusive and inaccurate, establishes that I did not rely on a specific number of trips in my sentencing decision, I knew that the number of trips was a guess, and that what was most important was the $200,000 threshold.

I also made clear that my sentencing decision was informed not by the number of trips or various details revealed in the Levey emails, but by the length of the scheme, the extent of the scheme in terms of having

setting up a separate entity in which to surreptitiously funnel bribe payments, and the breach of the public trust. I noted Defendant's emphasis on the lack of financial harm to the City. Id. at 28 ("Much has been made in this case about how, when we looked at the result, the City of Portland got perhaps the best deal that they could have gotten notwithstanding, perhaps because of Mr. McCoy's efforts."). As I stated then, "[t]hat's not the point." Id. Rather, my concern was that Defendant, a public employee, had rigged the competitive bidding process and that [*33] by doing so, had "brought into question" the "whole reputation of the community[.]" Id. at 28-29. Defendant's conduct ran counter to society's expectation that city employees do their best to make sure that the system is fair, "for everybody." Id. at 29.

Then, I noted that the "other aspect of this case that is remarkable to me" was that the bribe scheme lasted ten years. Id. (referring to the years 2002 and "extending to 2010, 2011"). The years, as noted above, were agreed to by Defendant at his plea hearing. Further, I remarked on the "sophisticated" nature of the bribe-giving and taking, "with the creation of this enterprise in order to help hide what was going on." Id. Rather than attribute the scheme to ego and ambition as suggested by Defendant, I concluded that Defendant "was just being greedy" by "taking advantage of favors and money that was offered to him in exchange for tilting the board." Id.

Further, I acknowledged several points Defendant made in support of a sentence of probation. Id. at 30. I noted the many positive things one could say about Defendant's character, that the likelihood of re-offending was low, and that it would be a challenge for the Bureau of Prisons to provide adequate medical care [*34] to Defendant. Id. I acknowledged the impact a prison sentence would have on Defendant's family members. Id. However, as I explained:

> But when I evaluate everything that has happened in this case, I am left with the conclusion that Mr. McCoy has to go to prison based on these circumstances. I am required to consider the guideline range, as I've already stated, as set forth in the presentence report.
>
> I'm required to address a sentence that looks at the nature and circumstances of this offense. I have already discussed that. I'm required to consider Mr. McCoy's history and characteristics. I've already described those.
>
> I have described why this is a serious offense and what it has done to the public and confidence in our system. Notwithstanding the other points that have

United States v. McCoy

been made by the defense, that they didn't suffer - - that the City of Portland didn't suffer a monetary loss as a result of these, there's still a loss. There's a loss in confidence on the part of the public vis-à-vis the City of Portland as a result of these kinds of events. It's devastating.

I need to consider, also, beyond the seriousness of the offense, promoting respect for the law and providing just punishment[.]

Id. at 30-31 [*35] .

Defendant cannot point to anything in the record creating the inference that but for Price's failure to more forcefully challenge the Government's argument in its Sentencing Memorandum and the Levey emails on which the argument was based, and the Trip Bribe Chart, his sentence would have been different. Suggesting that without this information he would have received a sentence lower then twenty-four months is complete speculation. Thus, Defendant fails to establish that but for Price's alleged unprofessional errors, the outcome of his sentencing would have been different.

In summary on Ground Two, Defendant fails to establish that Price's strategic decisions to emphasize the arguments in favor of a sentence of probation, to not expressly challenge the alleged misrepresentations in the Levey emails, and to not dwell on the over-inclusive number of trips in the Trip Bribe Chart, were unreasonable and amount to constitutionally ineffective assistance of counsel. Even assuming Price's decisions were error, Defendant fails to demonstrate prejudice because the record establishes that the alleged misleading information presented by the Government in its Sentencing Memorandum did not affect [*36] the sentence he received.

C. Ground Three: Price's Failure to Accede to Defendant's Request During Sentencing to Challenge the Evidence

Although Defendant raises this as a separate basis for relief, the previous discussion makes clear that Price provided constitutionally adequate representation and even if he erred, Defendant fails to establish prejudice. The only point to add here is that while Price advised Defendant to avoid challenging the Levey emails and the Trip Bribe Chart during the sentencing hearing, Defendant had the opportunity to speak with the Court and make any statement he desired. He did, in fact, state that he himself had paid for the majority of his vacations. He did not, however, raise a more specific objection to the evidence. That was Defendant's choice.

CONCLUSION

Defendant's Motion to Vacate or Correct Sentence under 28 U.S.C. § 2255 [60] is denied. Defendant's motion for appointment of counsel [67] is denied. The Court declines to issue a Certificate of Appealability on the basis that petitioner has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED. Dated this 6 day of September, 2016

/s/ Marco A. Hernandez

Marco A. Hernandez

United [*37] States District Judge

End of Document

# Exhibit F

https://www.oregonlive.com/news/2011/08/federal_agents_raid_portland_p.html



OREGONLIVE
The Oregonian

# Federal agents raid Portland parking offices in public corruption investigation of parking manager

Updated Aug 10, 2011; Posted Aug 10, 2011

Comment  0 shares

By **Maxine Bernstein | The Oregonian/OregonLive**

View full size **Ross William Hamilton/The Oregonian 2002** Ellis McCoy, City of Portland Office of Transportation Parking Operations manager demonstrates the new parking machines near Pioneer Courthouse Square.

About a dozen federal agents raided the downtown office of Portland's parking manager this morning and served a grand jury subpoena for city transportation records amid an intensifying public corruption investigation.

FBI and Internal Revenue Service agents showed up unannounced at parking manager Ellis K. McCoy's city office on the eighth floor of the Portland Building about 9:25 a.m., as others searched McCoy's Hillsboro apartment.

bb



cc



The joint investigation by the two federal agencies appears to be focused on McCoy's relationship with Tampa businessman George Levey, now president and chief executive officer of

Cale Parking Systems USA Inc.

, the contractor supplying Portland's multi-space parking meters called

SmartMeters

.

The inquiry is looking at bribes or kickbacks Levey allegedly gave to McCoy in exchange for city contracts with Cale -- accusations that were repeatedly raised by McCoy's subordinates and led to an internal city investigation three years ago. It's not clear what the city inquiry found. McCoy has remained as Portland's parking operations manager since 2001.

Gallery: Federal agents raid home and office of Portland parking manager

This morning, the U.S. Attorney's office informed the Portland city attorney's office and Mayor Sam Adams, who has been in charge of the parking and transportation bureau since he became a city commissioner in 2005, of the search once it was



became a city commissioner in 2005, of the search once it was under way. Adams was presiding at the city council meeting at City Hall this morning as the searches occurred.

Gerri Badden, a spokeswoman for the U.S. Attorney's office, confirmed this morning that a federal search warrant was served at an office of the Portland Bureau of Transportation. U.S. Attorney Dwight Holton called the mayor this morning just minutes before the searches began.

"Since this is an ongoing investigation, we cannot comment on the matter,'' Adams said, in a written statement. "The City of Portland is cooperating fully with the investigation.''

Later, Adams added, "I'm very concerned, obviously. This is a city and a state that prides itself on, you know, clean government. So I'm concerned and want to make sure we're good partners with the FBI and the Department of Justice so they can do a very thorough job in their work.''

By 12:45 p.m., Adams issued a release, saying McCoy will be placed on paid administrative leave immediately.

Adams declined to provide specific answers to questions about oversight by the Portland City Council, which approved parking meter contracts that exceed $20 million.

Portland Commissioner Randy Leonard said he had yet to be briefed and wanted more information. Commissioners Dan

ee



Federal agents raid Portland par... × +

← → C  🔒 oregonlive.com/news/2011/08/federal_agents_raid_portland_p.html

Portland Commissioner Randy Leonard said he had yet to be briefed and wanted more information. Commissioners Dan Saltzman and Amanda Fritz did not comment. Portland Commissioner Nick Fish also declined to discuss it. "Because this is a criminal investigation, it's not appropriate to comment on the substance of the allegations, other than of course we take them very seriously,'' Fish said.

The subpoena demanded that the city preserve the Bureau of Transportation's computer records.  Federal agents were meeting with McCoy at his office this morning.

Meanwhile, by 11:30 a.m. at McCoy's home, agents started hauling out boxes of papers and a desktop computer from his Hillsboro home.

Another team of federal agents today searched the Tampa offices of Cale Parking Systems USA Inc., the parking meter wholesaler.

The City of Portland, in contracts initiated by McCoy, has agreed to pay more than $20 million to Levey's company for its SmartMeter parking pay stations and related services between 2004 and 2016, city records show.

Cale Parking System USA's website says it employs 5 to 9 people. It provides more than 50,000 multi-space meters in numerous cities across the country, including in Washington, D.C., Baltimore, Indianapolis, San Diego, Chicago and Pasadena.



# Exhibit G



# Exhibit H

jj

https://www.cityofboston.gov/oldnews/Default.aspx?id=3678





kk

# Exhibit I

https://www.cityofboston.gov/towing/alerts/





mm

https://www.cityofboston.gov/towing/alerts/faq.asp







**Why did I receive an alert when I was not towed?**

In rare cases constituents may receive alerts when their car was not towed. Three possibilities are: 1) a typo was made in reading or entering the license plate number, in which case the make/model of the towing record will not match your vehicle. If 2) you moved your vehicle at the last minute from a street scheduled for street sweeping, then you may have been successful in escaping the tow by removing your vehicle after it was telephoned in by the towing company, but before they could hook up a winch to your car. In either of these cases, you can safely ignore the alert, or you can optionally call the towing line to report the error in the database. If 3) you received an alert for a license plate which you held in the past, but was reissued by the registry to another person's vehicle, then please click the unsubscribe link in the alert you received, and you will never receive future communication related to that plate.

Contact Info

Email Notifications

Text Size:

Privacy & Security     © City of Boston

# Exhibit J

https://www.bbb.org/us/or/portland/profile/towing-company/retriever-towing-1296-61000273 (as accessed July 25, 2019 and earlier)



https://www.bbb.org/us/or/portland/profile/towing-company/retriever-towing-1296-61000273 (as accessed Oct. 4, 2019)





rr





# Exhibit K

https://www.portlandoregon.gov/attorney/article/481053





vv

# Exhibit L

**CONTRACT TOW INVOICE**

**RETRIEVER TOWING**
1551 N.W. QUIMBY
PORTLAND, OREGON 97209
**(503) 222-4763**

INVOICE NO. PR- 44146
CALL NUMBER: 5570W
TOW NUMBER: 24653

REQUESTED BY: M/SG
DATE OF TOW: 12-21-17
TIME RECEIVED: 0851

| LICENSE | STATE | VIN | MAKE | MODEL | STYLE |
|---|---|---|---|---|---|
| 6DNEGPU | CA | 1HMCG 5646 XC 003211 | Hond. | Accord | 4DR |

| YEAR | COLOR | DRIVEABLE? YES ☑ NO ☐ | KEYS? YES ☐ NO ☑ | AGENCY (CIRCLE ONE) PARKING MCSO PPD ODOT TRI-M PORT FAIRV |
|---|---|---|---|---|
| | Silver | | | |

TOWED FROM: Southside SW Hall 4th-5th
TOWED TO: 1551 NW Quimby

| TIME OUT | ON SCENE (10-97) | LEAVE SCENE | NOTICE OF COMPLETION TO TOW DESK | | RELEASED BY | RLS NOTICE TO TOW DESK | | DOLLIES | FLATBED |
|---|---|---|---|---|---|---|---|---|---|
| 0852 | 0917 | 0924 | TIME 1002 | CITY ID 2777 | AY | TIME 1340 | CITY ID AY | FRONT UP ☑ REAR UP ☐ | |

| TOW DRIVER | TRUCK | RELEASE REQUIRED? YES ☐ NO ☐ | HOLD? (DATES AND TIMES) ON: OFF: | OUT OF DIST MILEAGE START END | TYPE OF TOW |
|---|---|---|---|---|---|
| 2777 | 2210 | | | | 30 meter Rate 2+ |

RELEASED TO NAME: Andrew Grimm
DRIVERS LICENSE #: GRIMM WAAB11417
STREET ADDRESS: 5133 46th Ave NE

CITY: Seattle
STATE: WA
ZIP: 98105
TELEPHONE: 650-422-8053

BILL TO: _____

DAMAGE PRIOR TO TOW

FRONT — LEFT — REAR — RIGHT

CONTENTS: Am Fm CD

CONDITION: Fair

I HAVE READ AND UNDERSTAND THE NOTICE INFORMATION ON THE BACK OF THIS FORM.

RELEASED TO: Andrew Grimm
RLS DATE: 12/30/17
RLS TIME: 1340

(OVER FOR IMPORTANT RIGHTS INFORMATION)
TOWING COORDINATOR: Marian.Gaylord@portlandoregon.gov (503) 865-2489

| CHARGES | | |
|---|---|---|
| TOWING | | 128 00 |
| DISPATCHING | | |
| CITY COST RECOVERY | | 30 |
| STORAGE 10 DAYS @ $27 EA | | 270 00 |
| ODD MILE ☐ LAB/STNDBY ☐ | | 15 |
| CITY RETOW ☐ GATE FEE ☑ | | 45 00 |
| LIEN FEE ☐ PE SVC FEE ☑ | | |
| FUEL SURCHARGE | | |
| FEE EVENER | | |
| **TOTAL** | | **514 00** |

PAYMENT METHOD: VISA ☑ M-C ☐ AMEX ☐ DISCOVER ☐ DEBIT ☐ CASH ☐
LAST 4 DIGITS OF THE ACCT. NUMBER & EXP. DATE: 2837 11/19

xx

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing MOTION FOR JUDICIAL NOTICE WITH EXHIBITS with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: October 4, 2019

Respectfully submitted,

DIGITAL JUSTICE FOUNDATION

*/s/ Gregory Keenan*
Gregory Keenan
81 Stewart Street
Floral Park, NY 11001
(516) 633-2633
gregory@digitaljusticefoundation.org

*Attorney for Appellant Andrew Grimm*